HOLMES ET AL. *v.* SHARRETTS ET AL.

[No. 195, September Term, 1961.]

362

Decided April 18, 1962.

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, MARBURY and SYBERT, JJ.

*A. Slater Clarke,* with whom were *Lawrence J. Simmons* and *Richard A. Mehler* on the brief, for the appellants.

*Nathan Patz* for the appellees.

SYBERT, J., delivered the opinion of the Court.

The essential question presented here is whether the Chancellor erred in holding a voting trust and employment and management agreements to be legally valid and binding.

The involved facts, detailed in twelve volumes of stenographic transcript, begin with the attempted purchase by Constas G. Basiliko (one of the appellants-plaintiffs) of several Maryland properties located mainly in the Washington,

D.C. suburban area, and valuable for commercial development, from one Max Offenberg. The transaction was being conducted by Basiliko in the name of one Louis Sommers (who, it appears, had been dead for some time) because of Offenberg's refusal to deal with Basiliko after experiencing some difficulties and alleged sharp practices on Basiliko's part in prior transactions. Offenberg testified that he did not realize he was dealing with Basiliko at the time of the negotiations in question. A contract for the sale of the properties was ultimately drawn up bearing the name of Sommers, as purchaser, and a deposit was made with funds advanced by one Schweitzer, not a party to the contract. The contract was then assigned to Basiliko, the assignment bearing the purported signature of the deceased Sommers. Basiliko, however, was unable to obtain the necessary financing to close the contract, which called for a purchase price of $427,500. Although extensions of time for settlement were granted, the continuing default of the purchaser led to the setting of a final deadline for cancellation of the contract by the seller, Offenberg, which was not met. Basiliko's claim of later commitments by third parties to supply the needed capital and his allegation that Offenberg had accepted a later payment of another $10,000 as a further deposit are not supported by the testimony or documentary evidence.

Meanwhile, the appellee, R. Carleton Sharretts (defendant below), an attorney who was representing Basiliko in regard to certain unrelated tax problems, learned of his efforts to obtain the properties in question along with two associates, David A. Holmes and Z. Sigmund Sachs (the other appellants), and also of Basiliko's offer to pay a bonus of $100,000 for a one year loan of $250,000, plus a finder's fee of $25,000. Since Offenberg refused to enter into any further transactions with Basiliko, or any agent of his, it was agreed between Sharretts and Basiliko that Sharretts should negotiate with Offenberg on behalf of the Dubladenhill Corporation ( a cross-plaintiff below and cross-appellant here, along with Sharretts). The corporation had previously been formed by Basiliko, Holmes and Sachs for the purpose of acquiring the properties. The various understandings between Sharretts and Basiliko

were formalized in an "agreement and management contract" of January 14, 1958 (to which the corporation was made a party), which incorporated within its terms certain provisions and clarifications set out in two letters from Sharretts to Basiliko. The agreement provided that 85% of the stock in the corporation should be issued to Basiliko, with the remaining shares divided equally between Holmes, Sachs and Sharretts. It further provided for the return to the corporation of all the issued stock endorsed in blank and for the issuance of a certificate for the aggregate amount of stock to Sharretts as sole "voting trustee" for all of the stock, with the power in Sharretts to draw up a voting trust agreement at a subsequent time. Various other clauses of the agreement provided for the payment of $100,000 bonus to Sharretts if he should be successful in procuring a loan, and the setting up of an employment contract making Sharretts general manager and his brother, Douglas, assistant manager of the corporation. There was also a specific declaration in one of the letters incorporated into the agreement to the effect that Sharretts was not to be considered as acting as attorney for Basiliko. The employment contract was executed by the corporation and the Sharretts brothers on January 28, 1958.

The voting trust agreement, provided for in the management contract, was drafted by Sharretts and was executed by the appellants and Sharretts on February 20, 1958. It will be referred to in greater detail hereinafter. Its use appeared necessary to the parties as a positive assurance to Offenberg that the property would not be under Basiliko's control.

The Dubladenhill Corporation, previously organized but dormant, was reactivated by Sharretts and new officers designated, Sharretts becoming president and his brother vice-president and secretary. Thereupon Sharretts began negotiations with Offenberg to purchase the property in his own name. On February 5, 1958, a contract for the sale of the property was executed by Offenberg and Sharretts, which provided in effect that if title were taken in the name of the corporation, the corporation was to be controlled as to voting power by Sharretts. As a further safeguard, Offenberg re-

quired that quitclaim deeds or releases be exchanged between himself and Basiliko and his wife. In effect, Offenberg released any claims he might have against Basiliko as a result of alleged improper conduct by Basiliko in regard to the subject property. The Basilikos in turn released any claimed interest they might have in the property.

Numerous problems arose which occasioned great delay in settlement under the contract between Offenberg and Sharretts. One problem, significant for the purposes of this opinion, involved a tax claim recorded by the Internal Revenue Service (I.R.S.) against Basiliko resulting in a lien against the property in question. The testimony shows that Basiliko had informed the I.R.S. that he had an interest in the property *after* he had executed the release to Offenberg and the management agreement, in which he renounced any claim he might have to the property. The tax claim was paid in part ($27,000) by Sharretts, using corporate funds, in return for a full release of all I.R.S. liens against Basiliko in respect to the properties. This had to be done, according to Sharretts, in order to clear the way for the much delayed settlement under the property contract, since the title insurance company involved refused to issue a required policy until the I.R.S. liens were released.

It was not until November 20, 1959, that the settlement took place, Offenberg transferring title directly to the corporation. Sharretts had obtained sufficient funds through loans to the corporation from various sources to provide the requisite cash payment, over and above a sizable deed of trust note taken back by Offenberg. By this time differences had arisen between Basiliko and Sharretts, and before the settlement occurred the instant suit was filed by Basiliko and the other appellants, on September 11, 1959, seeking cancellation of the voting trust and management agreements because of alleged illegality and fraud. They also asked return of their respective stock certificates deposited with Sharretts under the voting trust agreement, and for the removal of Sharretts as voting trustee because of alleged acts of mismanagement and conflict of interest. Sharretts answered, denying the material allegations, and on behalf of himself and the Dubladenhill Corpo-

ration he filed a cross-bill in which he sought to have the voting trust and the management agreements declared valid and enforceable, and to have the appellants enjoined from interfering with the exercise of his powers as voting trustee and with his management of the corporation. He also prayed for a decree *in personam* against Basiliko in favor of the corporation for the $27,000 paid by it on behalf of Basiliko to the I.R.S., and for a lien in that amount in favor of the corporation against Basiliko's voting trust certificate.

After hearing testimony extending over several weeks during which scores of exhibits were introduced, the Chancellor passed a decree dismissing the appellants' original complaint and granting all of the prayers in the cross-bill, including a decree *in personam* in favor of the corporation against Basiliko for the $27,000 item, with the exception that the court refused to impress a lien upon the voting trust certificate of Basiliko. The appellants entered this appeal. Sharretts and the corporation also appealed because of the exception just mentioned, but stated in brief and argument that their appeal is not being pressed, so we will disregard it.

I

Appellants' first contention is that the voting trust agreement was void under the relevant Maryland statute in that it provided for the termination of the trust five years after the happening of an uncertain and contingent event, and so might have extended beyond ten years, and also because it failed affirmatively to express any proper business purpose.

The statutory provision is Art. 23, § 45, Code (1957), which reads:

> "Any one or more stockholders of a corporation may confer upon a trustee or trustees the right to vote or otherwise represent their shares for a period not to exceed ten years, by entering into a written voting trust agreement specifying the terms and conditions of the voting trust, by depositing an executed copy of the agreement with the corporation at its principal office, and by transferring their shares to such trustee

or trustees for the purposes of the agreement. Every other stockholder, upon his request therefor, may by like agreement in writing also transfer all or any part of his shares to the same trustee or trustees and thereupon may participate in the terms, conditions and privileges of such agreement."

The voting trust agreement contains the following reference to its duration:

"(11) *Termination of Voting Trust.* This Agreement and the voting trust herein provided shall terminate in any event at the close of business five (5) years after the Corporation shall receive title by deed to any real estate conveyed to the Corporation under a certain contract dated February 5, 1958, wherein the said R. Carleton Sharretts, Jr., is contract purchaser."

Appellants' position is that the quoted clause shows that the voting trust could have existed for more than ten years from the time of its establishment in that the significant event from which its duration and termination should be measured, i.e., the transfer of the property, was uncertain of fulfillment, and secondly, that even if the property should be transferred, the time of transfer would be uncertain. It is contended that on its face the trust agreement is in clear violation of the statute, and that the fact that the property was actually conveyed to the corporation shortly after creation of the voting trust is irrelevant if the agreement was invalid at its creation.

As to the statutory provision, we have several times cited with approval the general rule that subsisting laws enter into and form part of a contract as if expressly referred to or incorporated in its terms, and the rule embraces alike those provisions which affect its validity, construction, discharge, and enforcement. *Whitworth, Adm'r v. Department,* 222 Md. 98, 158 A. 2d 765 (1960); *Griffith v. Scheungrab,* 219 Md. 27, 146 A. 2d 864 (1958). This rule has been applied to voting trusts in other jurisdictions. In *Lloyd v. McDiarmid,* 19 N. E. 2d 292 (Ohio 1937), the court, in upholding a voting trust

agreement against the contention that by its terms it could exceed the ten year limit set by the law of Ohio, stated (at 294):

> "It must be assumed that the parties to this trust agreement knew of this statute and contracted with reference to it. They are presumed to intend to contract in conformity to law and, in the absence of irreconcilable language, the applicable law is incorporated into their contract by implication of law."

See also *De Marco v. Paramount Ice Corporation,* 102 N. Y. S. 2d 692, 698 (1950).

However, in *Christopher v. Richardson,* 147 A. 2d 375 (Pa. 1959), cited by appellants, the Pennsylvania court rejected this rule of construction in regard to a voting trust, stating (at 376):

> "* * * In order to comply therewith [the statute] the voting trust agreement must, by its terms, be limited to a period of ten years or less, or *it must be clear from the terms and provisions of the agreement* that the voting trust will terminate in ten years or less." (Emphasis supplied.) [1]

While Professor Corbin, in his treatise on contracts, does not accept the view that statutes and rules of law are incorporated in a contract, he does recognize that:

> "* * * the processes of interpretation and determination of legal operations are almost always carried on together. Since different legal effects will usually follow different interpretations, this fact often plays an important part in the choice of one interpretation over another. Indeed, it is always true that words and

---

1. It may be possible that the Pennsylvania court was influenced in its decision by the circumstances of that case. It observed in a footnote that only ten per cent of the required payments under a contract there involved had been made in five and one-half years. Since complete payment determined the termination date of the trust agreement, it was apparently unlikely that payments would be completed within the 10 year statutory limit on voting trusts.

other symbols must be interpreted in the light of *surrounding circumstances; and the existing statutes and rules of law are always among these circumstances."* (Emphasis supplied.)

3 *Corbin, Contracts,* § 551.

With respect to the trust agreement now before us, we feel that a requirement that it be interpreted as though the ten year statutory limitation were expressed therein is implicit in its own terms and provisions. Drafted by an attorney and executed by men of business acumen, it specifically states that "* * * This agreement shall take effect and *be construed in accordance with the laws of the State of Maryland."* (Emphasis supplied.) In addition, in providing a yardstick for the duration of the voting trust, the agreement refers explicitly to a contract executed fifteen days previously, under which title to the property was to be taken within ninety days. It is not necessary here to decide whether voting trust agreements in Maryland incorporate by implication of law the statutes relevant to such agreements. In this case the express provision in the trust agreement that it should take effect and be construed in accordance with the applicable statutes necessarily had the effect of limiting its existence to the statutory period. Furthermore, it was obvious from the provisions of the agreement and surrounding circumstances that the voting trust would certainly terminate within the ten year limit, thus meeting even those tests set forth in the *Christopher* case, *supra,* and in the passage quoted from Professor Corbin's work, *supra.*

We also see no merit in the second part of appellants' contention that the voting trust agreement fails affirmatively to express any proper business purpose and for that reason is invalid. It does not appear that the statute—Art. 23, § 45, Code (1957), *supra*—embodies such a requirement. What it does require is "a written voting trust agreement specifying the *terms and conditions of the voting trust"*. (Emphasis supplied). Inspection of the instrument shows that the terms and conditions governing this trust and the powers and duties of the trustee are set out at length. Moreover, the agreement does specify a lawful purpose, i.e., that "the Depositing Stockhold-

ers deem it for the best interests of themselves and of the Corporation to unite the voting power held by them as holders of Common Stock * * *." We fail to find any provisions within the instrument which on their face would frustrate this objective or show an improper motive or be opposed to public policy. See Anno., 105 A.L.R. 123, and 5 *Fletcher, Cyc. Corp.* (Rev. vol. 1952), §§ 2078, 2080.

## II

Appellants next argue that because the voting trustee, Sharretts, owns five per cent of the stock in the corporation individually, both the legal and equitable title to those shares have merged in him and that part of the voting trust must fall. They further maintain that, under these circumstances, if all the beneficiaries of the trust agreement desire to terminate it, such relief should be granted. The appellants cite general law in regard to trusts to support their contention. This position is untenable, however, since it is completely alien to the area of voting trust agreements. One of the early arguments, in fact, against the concept of the voting trust was that it *separated* the voting power of corporate stock from its beneficial owner, although this argument has apparently lost force in the light of modern business conditions. See Anno., 105 A.L.R. 126, and 13 Am. Jur., *Corporations*, § 504. On the other hand our statute, above quoted, permits any or all of the stockholders to enter into a voting trust agreement, and requires that all stockholders must be afforded the opportunity to join therein if they so desire. See *Brune, Maryland Corporation Law* (Rev. ed.), § 208. The statute neither requires nor prohibits that a voting trustee be a stockholder or one who has subjected his shares to the voting trust. It would be a very odd result if the fact that one or more of the voting trustees were stockholders and were parties to the voting trust agreement should give the remaining stockholders the right to terminate the voting trust at will; yet that is the exact consequence for which the appellants contend. Such a contention, if sound, would render a voting trust agreement a very frail reliance for the busi ·'    ·'· terests of third parties or of stockholder voting trustees, which voting trust agreements are intended to serve. Such is not the

law in this State. Our statute certainly contains no such provision as the appellants would have us engraft upon it, and its tenor is directly opposite to the appellants' contention on this point.

## III

The appellants further maintain that the trial court erred in its failure to remove Sharretts as voting trustee for any one of several alleged reasons, namely, mismanagement of the trust, conflict of interest, or hostility to the beneficiaries of the trust.

An application by a *cestui que trust* to remove a trustee is addressed to the sound discretion of the court, and its action in refusing to remove the trustee will not be reversed unless it appears that such discretion has been abused. *Mangels v. Tippett,* 167 Md. 290, 173 Atl. 191 (1934) ; *Whiting v. Bryant,* 131 N. E. 2d 425 (Ohio 1956). The findings of the Chancellor on questions of fact are presumptively correct. *Parker v. Parker,* 222 Md. 69, 158 A. 2d 607 (1960). We find no abuse of discretion or clear error as to the facts in this case by the Chancellor. Maryland Rule 886 a.

Appellants recite many instances of alleged misconduct on the part of Sharretts which we will not set out in detail here. They appear to fall into three categories: (1) In those instances involving disputed matters of fact, as, for example, alleged falsifying of corporate minutes and the promise of financial assistance to Basiliko by Sharretts to save his home from foreclosure, the Chancellor, who heard the witnesses and thus had opportunity to judge their credibility, simply did not believe the evidence offered to support appellants' claims. We see no palpable error in the trial court's conclusions on the fact issues involved. (2) In other instances involving election by Sharretts of an allegedly unqualified board of directors, his borrowing of money without corporate authority, accompanied by payment of large discounts and bonuses, his providing for the payment of certain compensation to himself and his brother as managers of the corporation — all these matters were made part of the management agreement fully subscribed to by appellants before the establishment of the voting trust. That agreement specifically set out who would

constitute the corporation's board of directors, what their compensation was to be, and a recital that because of the difficulties which would be encountered in obtaining funds, it would be necessary to offer "attractive terms" to lenders. (3) As to instances in which Sharretts allegedly commingled funds, wrote checks to himself, hired an allegedly incompetent individual to carry out a survey in regard to authorized curb cuts near certain of the properties—while in isolation such actions, if true, might seem to support mismanagement and conflict of interest charges, the Chancellor's finding that they did not, in the light of explanations made, was not clearly erroneous.

The corporate reorganization and the voting trust arose out of the management agreement and had as its purpose one essential end—that of acquiring the properties in question and disposing of them at a substantial profit. Thus the manner in which the parties proceeded was much like that of a joint venture or enterprise, *Hobdey v. Wilkinson,* 201 Md. 517, 94 A. 2d 625 (1953), with the exception that Basiliko, by his own agreement, gave up control of the enterprise. Cf. *Eagle Star Ins. Co. v. Bean,* 134 F. 2d 755 (C. A. 9, 1943). The reason for this was the refusal of the owner of the properties—Offenberg—to convey to Basiliko or to a corporation controlled by him. On the other hand, utilization of Sharretts' services, and the voting trust device, gave promise of acquisition of the properties—a goal realized under Sharretts' tutelage. Thus the voting trust agreement created a relationship quite different from that which normally exists under such a trust. This Court has quoted with approval the principle enunciated in *Wabash Ry. Co. v. Am. Refrigerator Transit Co.,* 7 F. 2d 335, 344 (C. A. 8, 1925) that: " 'The courts will look through the form to get at the real intent of the association of individuals or corporations forming the organization, and, if rights of third parties have not intervened, will give effect to the real purpose of the organization in order to promote square dealing and effectuate justice.' " *Deboy v. Harris,* 207 Md. 212, 219, 113 A. 2d 903 (1955). The real purpose of the corporate setup here and the voting trust was the mutual profit of *all parties* to the agreement. In pursuance of that objective Sharretts, as voting trustee, was given extensive powers to obtain

all necessary funds for purchasing the properties, which operation involved the advancement of his own money for deposits and certain expenses and imposed personal liability on him as individual purchaser named in the contract of sale. It is obvious that Sharretts was acting, *and was expected by appellants to act,* in a much broader capacity than that of the ordinary voting trustee. It is in the light of these circumstances that the manner in which Sharretts operated the trust must be viewed. In this vein, it is also necessary to consider the fact that Sharretts explicitly terminated his attorney-client relationship with Basiliko as part of the management agreement subscribed to by Basiliko. We hold no admiration for some of the procedures employed by Sharretts (such as his shoddy method of keeping records, his commingling of corporate funds with his own, and his expenditure of certain corporate funds for his own personal use before they were due him as compensation). However, the peculiar nature of the relationship and the joint undertaking of the parties, as well as the fact that no apparent prejudice to appellants' interests has resulted, lead us to conclude that the Chancellor did not clearly err in refusing to remove the trustee. The matter of lack of prejudice is highlighted by the fact that Basiliko and his associates made no monetary contribution toward the success of the undertaking. It has been held that the removal of a trustee is a drastic action undertaken only when the subject of the trust is so endangered as to require intervention. *Whiting v. Bryant, supra,* 131 N. E. 2d 425 (Ohio 1956) ; *Ingalls v. Ingalls,* 59 So. 2d 898 (Ala. 1952). In this case, where Sharretts' own compensation depended on the success of the venture, such removal would indeed be drastic and would require more positive and weighty proof to substantiate the allegations of mismanagement or conflict of interest or hostility than appellants have been able to muster. At most, we perceive in this litigation a controversy between individuals intent on realizing the greatest possible personal advantage and profit, and not an action based upon or intended to subserve the corporate or stockholding interests, and it is in that light that we are constrained to uphold the Chancellor on this question.

Cf. *Whiting v. Bryant, supra; Frost v. Carse,* 108 Atl. 642 (N. J. 1919).

## IV

The fourth contention of the appellants is two-pronged, both parts being based upon obvious misinterpretation of the words and intent of the Chancellor in his memorandum opinion and decree.

Appellants first say that the decree is fatally inconsistent with the opinion because the decree granted the Dubladenhill corporation a $27,000 decree *in personam* against Basiliko for the payment to I.R.S. for release of the tax liens, while the opinion had stated that under the circumstances of the case a *lien* for the payment should not be imposed against Basiliko's *voting trust certificate.* The appellants overlook the Chancellor's statement in the opinion that the sum paid "was Basiliko's personal debt and is now owed to the Corporation". The decree, providing for reimbursement to the corporation without a lien on Basiliko's stock, is in exact accord with the views expressed in the opinion. We may add that the "opinion does not constitute a part of the decree, and the appeal, of course, is only from the decree." *Brenneman v. Roth,* 212 Md. 491, 497, 130 A. 2d 301 (1957).

The other prong of this part of the attack on the decree is that it is based upon an erroneous fact or conclusion. The claim is that the Chancellor was under the misconception that the $27,000 payment amounted to a compromise of the whole amount of taxes due from Basiliko, whereas in fact it was accepted by I.R.S. as part payment only. Even if the argument is assumed to be material, it ignores an explicit statement in the Chancellor's opinion that the payment was made "* * * *in part payment* of Basiliko's tax obligations". (Emphasis supplied.) We need say no more on this score.

Under this division of their brief, appellants further argue that Sharretts as trustee had no authority to use corporate funds to relieve the alleged tax liability of Basiliko and his wife. However, as the Chancellor observed, release of the tax liens was a matter of necessity for the continued business existence of the corporation. The title insurance necessary to

effectuate the purchase could not have been obtained without release of the liens and further delay meant probable collapse of the whole venture. The payment was therefore for the benefit of the corporation and the Chancellor's conclusion in this regard was sound.

## V

Finally, the appellants argue that the voting trust agreement and other documents involved in this case were signed with the understanding that Sharretts would render immediate financial assistance to save Basiliko's home from foreclosure, and that Basiliko would receive from the corporation a certain salary commencing immediately and an allowance for his alleged equity in the property being purchased. While partial assistance was given Basiliko in regard to saving his home, the salary and equity allowance were allegedly withheld. The appellants also maintain that an attorney-client relationship existed between Sharretts and Basiliko, and that Sharretts used this superior position to compel appellants to sign the necessary documents and to induce Basiliko mistakenly to believe that he would be entitled to the above mentioned benefits as a result of the agreement. Claiming fraud on the part of Sharretts and unilateral mistake on the part of appellants as to the benefits due Basiliko under the agreements, they seek to have the whole transaction set aside.

Appellees deny any fraud and claim that the question of unilateral mistake was not raised below and thus cannot now be considered on appeal. However, it is clear from a reading of the opinion of the Chancellor that he did consider the issues involved in this contention, though perhaps they were not framed as they are in this appeal.

As to the matter of fraud, the Chancellor observed that, even in the absence of a finding that the attorney-client relationship between Sharretts and Basiliko had ended, there was no showing of any fraud perpetrated or undue influence exercised by Sharretts in the consummation of the agreements in question. The charge of fraud was based on the proposition that Sharretts had pressured Basiliko to sign a letter, incorporated as part of the management agreement, which acknowl-

edged the termination of the attorney-client relationship between them and required that Basiliko obtain independent legal advice as a condition precedent to proceeding with the transaction. The agreement itself also provided for the payment of the aforementioned large bonus to Sharretts if he succeeded in obtaining loans, and also set up the other management arrangements discussed above. According to Basiliko's testimony the letter was presented to him at a critical time in the transaction when it was impossible to procure independent advice before proceeding. Sharretts denied that he practiced any fraud or pressure upon Basiliko. Thus a question of fact was presented for determination by the trier of fact, and we do not find that the Chancellor was clearly erroneous in his findings. As the Chancellor noted, Basiliko, as well as the other appellants, were men of "extensive business experience, ability and agility", who must have been well aware of the nature of the instruments being signed. The terms and provisions of the instruments in question are clear in their import and and it was not until the institution of these proceedings, more than a year and a half after the agreements were executed, that allegations of fraud and undue influence were made.

As to appellants' claim of unilateral mistake — that they would not have signed the voting trust agreement and other relevant documents had it not been for their understanding (not reduced to writing) that Basiliko would receive certain monetary benefits, we see no error in the Chancellor's refusal to believe appellants' testimony in this regard. This conclusion of the court was based upon not only the denial by Sharretts that any such understandings existed, but also upon the fact that the agreements between the parties were set out in great detail in the various documents, and that therefore it seemed inconceivable that promises of this importance to Basiliko would not also have been incorporated as part of the written agreements. This conclusion, in our view, is a sound one, and the contention that appellants were led to believe that such understandings did exist by their own unilateral mistake or by Sharretts' fraud, is untenable.

In their reply brief, appellants complain about certain letters sent to the Chancellor by appellees' counsel after the con-

clusion of the trial and prior to the date of decision, allegedly without the consent or knowledge of the appellants. The first letter referred to allegations made in a petition in bankruptcy filed by Basiliko against the Dubladenhill Corporation which had come to the attention of appellees' attorney, and the second letter referred to the amount realized in certain foreclosure sales of some of the properties involved in this case, offered by appellees as justifying the size of the contingent compensation provided for Sharretts in the agreements in the instant case.

We do not think that these letters fall within the intendment of Canon 17, *Canons of Judicial Ethics,* and we note that copies of the letters were sent to opposing counsel when the originals were sent to the judge. Furthermore, we fail to see how appellants' cause could have been prejudiced by the material contained in the letters.

Having found no error in the decree, we will affirm.

> *Decree affirmed, costs to be paid*
> *by appellants.*