OSBORNE ET UX. *v.* TALBOT ET AL.

[No. 71, October Term, 1950.]

*Decided January 17, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Francis H. Urner* and *Evan McC. Crossley* for the appellants.

*Leo H. Miller* and *Edwin H. Miller*, with whom were *Miller & Miller* on the brief, for the appellees.

MARKELL, J., delivered the opinion of the Court.

This is an appeal, by a chiropractor and his wife, from a decree making perpetual an injunction granted against them upon the filing of the bill and perpetually enjoining them "from conducting or engaging in any business or profession in the buildings [*sic*] erected on lot No. 11 Section A of Northern Heights Addition to Hagerstown, but the improvements on said lot shall be occupied and used for residence purposes only".

By a deed from Hagerstown Mutual Realty Company, dated October 25, 1910 two parcels of land, which were part of Northern Heights Addition, comprising lots Nos. 11 and 12, each fronting 100 feet, and an adjoining parcel, to be used only for park purposes, fronting 39 feet on the Terrace, were conveyed to Harry E. Bester, for $2,000, "subject to the following conditions, which the grantee by the acceptance of this deed hereby covenants to keep, Condition No. 1. That no shop, store, factory, saloon or business house of any kind, no hospital, asylum and no institution of any kindred nature and no charitable institution shall be erected or maintained on the premises hereby conveyed, but the said premises shall be occupied and used for residence purposes only and not otherwise. 2. That there shall not at any time be more than two residences on any lot of 50 feet. 3. That no residence or dwelling house shall be erected on any lot of 50 feet costing less than $2,500.00. 4. That no residence or dwelling house shall be erected or kept on said land wholly [*sic*] or within 50 feet of the curb line of Terrace

Street, said condition not to apply to verandas or porches. * * * For a more exact description of the above parcels, refer to the plat known as Northern Heights Addition, which has been recorded among the Plat Records of Washington County * * *". A plat, certified to be "a true copy of section A of Northern Heights Addition as shown on the Washington County Plat Record No. 2, Folio 101, the same having been made * * * in December, 1911" shows 19 numbered lots, including Nos. 11 and 12, fronting, most of them 100 feet, all more than 50 feet, No. 11, 80 feet to a 20 foot alley, on the east or the west side of the Terrace, and 18 unnumbered lots, evidently fronting, most of them 50 feet each, on the west side of Oak Hill Avenue, the next street east of and parallel to the Terrace. On the plat the northernmost 264.6 feet on Oak Hill Avenue, most of it behind and abutting on lots Nos. 11 and 12, the end of the 20 foot alley and the park area, is not divided into lots but is marked "H. E. Bester". This property had been conveyed to Bester, for $2,001, by a deed dated October 8, 1907 from J. Sumner Draper and wife, as comprising, among other lots, lots Nos. 106, 107, 108, 109, 110 and 111 on Oak Hill Avenue in Fairmount Park Addition, with reference to a recorded plat. The Draper deed contains no use restrictions except (1) a 20 foot setback from the sidewalk, (2) a minimum cost of $2,000 for any house, and (4) prohibition of sale of intoxicating liquors.

By a deed dated April, 1937, the trustee of the Bester estate conveyed to Clay K. Brandenburg and wife, for $10,000, a parcel of land extending 264.6 feet on the west side of Oak Hill Avenue and 239.22 feet on the east side of the Terrace, and comprising lots Nos. 11 and 12, the 20 foot alley and the park area and the Oak Hill Avenue lots conveyed by Draper, "subject to all easements, covenants and restrictions which are set forth in the aforementioned deeds [from Hagerstown Mutual Realty Company and Draper]." By a deed dated October 8, 1942, Brandenburg conveyed to defendants

the southernmost 60 foot frontage on Oak Hill Avenue, 180 feet deep westward, of the land conveyed by the 1937 deed, "subject to all the easements covenants and restrictions referred to in the [1937] deed * * *." Defendants, with constructive and presumably actual notice of the applicable restrictive covenants, have contracted to buy from Brandenburg lot No. 11 and have erected on it, and now occupy, a house that has cost them about $40,000.

Lot No. 12 was conveyed by Brandenburg to plaintiffs Ridenour, part in 1946, part in 1949. By deeds, of various dates from 1921 to 1949, from various grantors (other than Hagerstown Mutual Realty Company), other plaintiffs respectively acquired lots Nos. 6, 7, 8, 9, 10, 27, 28, 30 and 31, each fronting on the Terrace, in Section A of Northern Heights Addition. It is conceded that the Terrace is "one of the best residential sections in Hagerstown."

The bill alleges elliptically that [presumably the Realty Company] "caused said land [shown on the plat of Section A] to be restricted by the same covenants, restrictions and conditions, which are as follows:" [setting out conditions 1 to 8, inclusive, in the 1910 deed to Bester, inaccurately as to 2 and 3, viz., 2 as prohibiting more than one residence on any 100 foot lot, 3 as prohibiting any residence, on any 100 foot lot, costing less than $5,000]. It is admitted that condition 1, *supra*, is contained in the deeds to "other lots" than Nos. 11 and 12, but it is not clear what other conditions are contained in such deeds, or whether condition 1 is contained in all of them. No explanation has been given of the inaccurate allegation of conditions 2 and 3 in the bill. This inaccuracy, together with differences between the 1910 deed and the plat "made in December 1911", and the ineptness of conditions 2 and 3 in the deed as compared with those set out in the bill, suggest that the 1910 deed may have been the beginning of changes embodied in the 1911 plat, and that the conditions recited in the bill may have been contained in later deeds and should

have been contained, but were by error omitted, in the 1910 deed. In any event it is manifest (though perhaps not material) that the fact that the Terrace is "one of the best residential sections of Hagerstown" is not the result of the restrictive covenants in the 1910 deed. Subject to the requirement of a 50 foot setback, an apartment house of any height, or apparently four row houses each 25 feet wide, could be built on one 100 foot lot.

The bill alleges that defendant "plans to engage in the business of practicing his profession as a chiropractor in the basement of the building" on lot No. 11 and "has informed" one of plaintiffs "that he intends to occupy the building * * * as a residence and also conduct his office and practice his profession as a chiropractor in said building". The answer denies that defendant "has expressed himself as intending to conduct his office and professional practice exclusively in his residence but avers that he proposes only an incidental use of the said residence for professional office purposes, such use being supplemental, beyond usual office hours, to his regular office which is maintained in another location." The answer denies that defendant's intentions are in violation of any covenants or conditions restricting the use of his property or of the general plan or scheme of development of lots in Section A. The issues presented by the bill and the answer as to defendant's intentions have since been broadened. Defendant in his testimony in effect declined to confine his intentions for the future within the scope of his answer. He admitted he had expressed a desire to save office rent in the future, "as time might crawl up" on him and he might conduct a smaller practice entirely at his residence. But he refused to commit himself to any plans for the near or distant future. He also testified that he intends to perform at his residence his duties as Secretary of the Board of Chiropractic Examiners. He was appointed to that office in 1948. On the other hand, the lower court by its decree in effect refused to recognize any distinction

between practice of a profession wholly at or from one's residence and "incidental" practice to a limited extent in special circumstances, but construed the covenant that the premises "shall be occupied and used for residence purposes only and not otherwise" as prohibiting "conducting or engaging in any business or profession" on the premises. The court granted an injunction in the broadest terms, in the words of the covenant plus this implied prohibition, without any definition or limitation of "use for residence purposes only" or "engaging in any business or profession."

We cannot properly decide the case before us without considering the relation of our decision to matters not directly before us. A chiropractor is not a physician; his profession or calling is not the practice of medicine. *Crider v. Cullen*, 191 Md. 723, 63 A. 2d 618. Chiropractors, and presumably their patients, are much less numerous than physicians and their patients. Conceivably an office on the Terrace might have an indirect advertising value to a chiropractor. In view of the difficulty of obtaining physicians at night, especially in rural or suburban neighborhoods, physicians might be more welcome than chiropractors in restricted residence neighborhoods. One of the plaintiffs, who has been a patient of defendant, says she thinks "we are fortunate when we can call a doctor at night and get some medicine." However, construction of a contract, like exercise of the police power, cannot be determined by a plebiscite of neighbors. *Benner v. Tribbitt*, 190 Md. 6, 20, 57 A. 2d 346. If a majority of neighbors can prevent a chiropractor from practising in violation of a restrictive covenant, a minority of one can prevent a physician from so practising.

Four of the plaintiffs are physicians and their respective wives; all testified. In its opinion the lower court says, "I am * * * of the opinion that the weight of authority supports the conclusion that property which is restricted exclusively for residential purposes cannot be used as contemplated by Dr. Osborne. Since this sub-division

was laid out there has not been a single violation of the covenants in the deeds that it be used for residential purposes only. The Terrace is certainly one of the finest, if not the finest residential street in the City of Hagerstown. At least five physicians have had homes on this street and two of them testified in this case. None have ever attempted to practice their profession in the home and except in rare instances of an emergency nature, have gone to their offices in order to treat patients when that became necessary at night time or at other than regular office hours. There are many locations in Hagerstown where Dr. Osborne can do without any question being raised what he seeks to do in this highly restricted residence area. In fact many professional people in this community maintain their offices in their homes but I do not think that this is done in the face of restrictions such as here presented. * * * The business or professional use to which he now seeks to subject the property is purely one of degree and it might fairly be said that once established, the regulation of the use from a practical point of view would be uncontrollable". These statements, especially in connection with the testimony, we think, reflect a construction of the covenants which is materially narrower than the terms of the decree. The testimony shows, as the court says, that "in rare instances of an emergency nature" Dr. Bell and Dr. Wells have received and treated patients at their residences. These witnesses use "emergency" in much the same sense as defendant uses "incidental", but the emergencies apparently have been more rare (several times a year) and more actively discouraged than defendant's incidental use (once or twice a week) of his former residence on Oak Hill Avenue. Furthermore, Dr. Bell and Dr. Wells each receive at their residences many professional calls by telephone at night, on Sundays and holidays and also during the day, and by telephone give advice and sometimes prescribe medicine. Dr. Bell has an extension line from his office to his residence and the same telephone number for both office and residence.

Mrs. Bell answers calls at the house when the office girl is out. Dr. Wells has a separate telephone from his office to his residence and always during meal hours gets calls over the telephone. Dr. Bell says he receives at his residence possibly from 10 to 100 telephone calls a day. The opinion seems to recognize, and the testimony demonstrates, that there are exceptions to the statement that these physicians do not "practice their profession in the home". The decree, however, makes no exceptions at all.

The opinion seems (but perhaps was not intended) to imply that physicians who reside on The Terrace "have gone to their offices * * * to treat patients * * * at night" in order to avoid violating these covenants. Such an implication is not warranted. Physicians prefer to go to their offices because they have there facilities which are not available at home. Dr. Bell, when asked to define "residence purposes" said, "to use your home * * * [as] a place of refuge". This explains a hope of physicians and others to put some limit to their labors; it is not an interpretation of restrictive covenants. We agree with the lower court that these physicians have not violated their covenants. They have, we think, practised medicine at their residences, but not to an extent inconsistent with use "for residence purposes only". Every physician, lawyer, judge, clergyman or business man to some extent practises his profession, performs his office or transacts business at his residence by receiving people and receiving and making telephone calls, but he does not necessarily violate such a covenant. On the other hand, a business conducted entirely by telephone, e. g., a physicians' exchange or a baby-sitting agency, might constitute a violation of such a covenant. Such a construction of these covenants, we think, is reached from consideration of the words and history of the covenants and application of the rule of strict construction of restrictive covenants.

The narrower definition of "residence purposes only", which is reflected in the decree below, was well expressed

in a case in a Pennsylvania court of first instance, "Use as a private dwelling house means use by way of living, eating, sleeping and enjoying the various intellectual and social diversions incident to private family life. The practice of a profession, however, is, in part at least, for the purpose of gain. It is similar in that respect to the carrying on of a business or trade. It is no answer to say that doctors, lawyers and dentists frequently conduct their offices in their homes. To the extent to which they do this (at least habitually, regularly and continually), they are using part of their dwelling houses for other than dwelling house purposes." *Hogan v. Rose*, 1930, 14 Pa. Dist. & Co. 256, followed in *Stollsteimer v. Morgan*, 1940, 39 Pa. Dist. & Co. 270. This definition, which comprises little more than "eat, drink and be merry", we think, is too narrow. School children and undergraduate and graduate students are not the only persons who do "home work" in a house used "for residence purposes only". Even children may be actuated by a hope of future gain as well as an abstract love of learning. Most people at home occasionally think and read, frequently talk, and not infrequently "talk shop". We cannot say that when one is reading Aristotle or Shakespeare or Dickens or "Gone With the Wind", or a physician is talking politics or a politician is discussing medicine, he is within his rights, but when he is reading law or medicine or Dale Carnegie or a physician is talking medicine or a politician talking politics, he is violating a restrictive covenant. All the work of a particular gainful calling may be home work, incidental to the use of premises "for residence purposes only", *e. g.*, Trolloppe's self-imposed allotments of daily work on his novels. In this respect we see no difference between Ogden Nash's published verses (if written at home) and verses written by members of a literary club for their mutual enjoyment or by an individual for Christmas cards for his friends. If, however, a novelist or other author works with a staff of secretaries, proof-

readers or other assistants, such work would not be consistent with use of the premises for residence purposes only. Such activities might constitute use for both residence and business purposes, or for business with incidental residence use like the use of chambers in one of the Inns of Court by a barrister who resides at his chambers.

The covenants now before us were not new in 1910. In 1892 Plat No. 1 of Roland Park was recorded. *Wehr v. Roland Park Co.*, 143 Md. 384, 387, 122 A. 363. Covenant (1) in the 1896 deed from the Roland Park Company set out in the opinion in *Middleton Realty Co. v. Roland Park Civic League*, 197 Md. 87, 78 A. 2d 200, just decided, is substantially the same as Condition No. 1 in the instant case. Condition No. 1 is almost identical with covenant 1, in a 1920 deed, set out in the opinion in *Saratoga Building & Land Corp. v. Roland Park Apartment Stables Co.*, 146 Md. 152, 154, 128 A. 270. The other conditions in the 1910 deed to Bester are less restrictive than the covenants in the 1896 and 1920 Roland Park deeds, which in turn are less restrictive than those in other Roland Park deeds. 146 Md. 157, 128 A. 270.

The lower court expresses the opinion that the weight of authority supports the conclusion that property restricted exclusively for residence purposes cannot be used as contemplated by defendant. If weight means numerical weight, the careful review of cases in the opinion on demurrer perhaps supports this view. We have been referred to no case, and we have found none, in this court or in any court of last resort, which is directly in point on the facts. The cases cited are all cases in courts of first instance or intermediate appellate courts. The earliest case, in a Missouri Court of Appeals, *Semple v. Schwarz*, 1908, 130 Mo. App. 65, 109 S. W. 633, is generally in accord with the decision below; one of the latest, in a Texas Court of Civil Appeals, *Briggs v. Hendricks*, 1946, 197 S. W. 2d 511, is to the contrary. More persuasive on principle than these cases, we think,

is a statement of the New York Court of Appeals, by Judge Pound, "Construing the restrictive covenant as applying to use as well as construction (*Baumert v. Malkin*, 235 N. Y. 115, 124, 139 N. E. 210; *Powers v. Radding*, 225 Mass. 110, 114, 113 N. E. 782), the question remains, Does any use of the dwelling house for the purpose of conducting a real estate and insurance business therein, as matter of law, destroy its character as a private dwelling house? The suggestion has been made in judicial opinions that some kinds of personal business, such as that of a physician or a lawyer, may be carried on in one's dwelling house without inconvenience to the neighboring property holders and without changing the general private character of the use of the building. *Smith v. Graham*, 161 App. Div. 803, 809, 147 N. Y. S. 773, affirmed on opinion below, 217 N. Y. 655, 112 N. E. 1076. Doubtless this may become a matter of degree, so that we refrain from holding that the complaint does not state a cause of action, but it does not follow that if a physician sees his patients or a lawyer meets his clients at his house in a room which he calls his office, he thereby destroys the character of his home as a private dwelling house in the usual meaning given to such words. Music schools (*Baumert v. Malkin, supra*) and private hospitals (*Barnett v. Vaughan Institute*, 197 N. Y. 541, 91 N. E. 1109), which destroy the private character of the dwelling and offend the neighbors, differ widely from the case presented." *Schnibbe v. Glenz*, 245 N. Y. 388, 392, 157 N. E. 504, 505.

Though no case in this court is directly in point on the facts, the rule of strict construction of restrictive covenants has been so established and applied as to preclude holding that these covenants prohibit the practice of medicine. In *Yorkway Apartments v. Dundalk Co.*, 180 Md. 647, 26 A. 2d 398, 399, the question was whether certain covenants prohibited the erection of certain apartment buildings. The deed provided that the land should be used for residence purposes only, and no building of any kind whatsoever should be erected

or maintained thereon except dwelling houses and private garages. It also provided that "detached and/or semi-detached houses only may be erected and maintained on the plots fronting on Liberty Parkway; detached, semi-detached and/or attached houses may be erected or maintained on plots fronting on other streets." "Detached house", "semi-detached house" and "attached house" were each so defined as not to include the apartment buildings in question. It was held that such apartment buildings on streets other than Liberty Parkway were not prohibited. Provision that two kinds of buildings *only* may be erected on one street, but three kinds may be erected on other streets, was not an implied prohibition of any kind at all on any street other than the one named. In reaching this conclusion this court said, "* * * where the language employed to express a restrictive covenant so far involves a doubt as to require construction, the rule is that such covenants are to 'be strictly construed against the person seeking to enforce them', and that 'all doubts must be resolved in favor of natural rights and a free use of the property.' " *Bartell v. Senger,* 160 Md. 685 [693], 155 A. 174, 177.

"The grantee in the Bethlehem deed had the right, unless restricted by its terms, to construct any sort of dwelling house it desired upon the property. A restriction was placed upon the land fronting on Liberty Parkway, but in view of the rules of construction above set out, we cannot say that the last part of the clause relied on, restricted its right to construct only the types of dwellings enumerated. The point is narrow, but there is a doubt what was meant by this last clause. In view of that doubt, we construe it in favor of the free use of the land for residential purposes, which permits the erection of the kind of apartment houses desired by the appellant." 180 Md. 650, 26 A. 2d 399. As there is at least a doubt that the practice of medicine is prohibited, we must hold that it is not prohibited.

If the practice of medicine is not prohibited, it does not follow that any and all practice is permitted. Before

and since 1910 some physicians so constructed or altered their houses that architecturally their offices were offices and were distinct from, though connected with, their residences. Such buildings would not be permitted by the covenants now before us. It is undisputed that defendants' house is architecturally one of the best residential types. Many physicians now maintain offices, very different from most physicians' offices in 1910, with laboratories, various instruments and other facilities, associate physicians, secretaries, nurses, technicians or some such facilities or assistants or both. Such offices would not be permitted by these covenants. As usual, the line can only be drawn case by case. Defendant's testimony indicates, not very clearly, that for what he calls incidental use of his residence the only equipment he would locate in the house would be "an adjusting table in the basement, the same as I had out at my home for my family, [and] any of the low voltage currents which are portable, the same as you would use for a house call." There is an outside entrance to the basement, and the basement, if not so used or put to some special use, e. g., as a billiard room or a children's play room, might not be used at all or might be put only to the miscellaneous uses of an unfinished cellar. We do not think such incidental use of the basement would impair the use of the house "for residence purposes only."

If defendant should abandon his present office and remove it to his residence, there is not sufficient evidence, as to how the present office is conducted, to enable us to determine whether or not such an office at the residence would violate the covenants. Our decision will be without prejudice to further proceedings in this case or a new case, if and when such a change is made or threatened and plaintiffs are in a position to show the material facts.

Defendant should not be permitted to maintain a professional or business sign on his residence. A sign is a business use of property, separable from residential

use and also from incidental use in practice of a calling, and is therefore prohibited by these covenants.

Defendant proposes to keep in the basement five filing cabinets and other files relating to his duties as Secretary of the Board of Chiropractic Examiners and to perform his duties there. We see nothing in the covenants to prevent a physician or a lawyer or the Secretary of Medical Examiners, Bar Examiners, or Chiropractic Examiners from doing his "paper work" at home, including attention to correspondence or preparation or marking of examination papers. Defendant, however, says that at certain times "there are many, many candidates coming and getting applications, some by writing and some by personal appearance." Maintenance of such a public office to receive so much of the public as may have occasion to come in, is just as clearly a violation of the covenants as maintenance of a marriage license bureau would be.

> *Decree reversed and case remanded for passage of a decree in accordance with this opinion, costs above and below to be paid, one-half by plaintiffs and one-half by defendants.*