RICHARD METIUS ET AL. *v.* EDWARD J. JULIO
AND CARL T. JULIO, CO-PARTNERS T/A
CROMWELL REALTY COMPANY

[No. 720, September Term, 1974.]

*Decided July 23, 1975.*

The cause was argued before ORTH, C. J., and DAVIDSON and LOWE, JJ.

*William F. Mosner* for appellants.

*Benjamin R. Civiletti* and *Paul F. Strain* for appellees.

DAVIDSON, J., delivered the opinion of the Court.

This appeal is from an order of the Circuit Court for Baltimore County dismissing a bill of complaint for injunctive relief sought to prohibit the construction of buildings alleged to be violative of an agreement, restricting the type of development to occur on a 23.2797 acre parcel of land lying south of the Baltimore Beltway between Providence Road and Cromwell Bridge Road. The agreement created equitable restrictions [1] on the subject property, which provided, among other things, that it be developed with buildings not more than *three stories in height.*

There was evidence to show that before 22 July 1971 the subject property was principally owned by Cromwell Valley, Inc. On 6 March 1965 the County Board of Appeals of Baltimore County (Board) granted an application by the

---

\* Note: *Certiorari* denied, Court of Appeals of Maryland, October 6, 1975.

1. A restriction upon the use of land may be enforced in equity even though there is no privity of estate between the original convenantors and covenantees in respect of the premises upon which the restriction is imposed. Meade v. Dennistone, 173 Md. 295, 302-03, 196 A. 330, 333-34 (1938); 3 *Tiffany, Law of Real Property,* § 858, pp. 471-72 (3rd ed. 1939). Such restrictions are variously termed negative easements, equitable servitudes, or merely equities attached to land and are enforceable against grantees who take with notice of the restriction. Turner v. Brocato, 206 Md. 336, 346, 111 A. 2d 855, 861 (1955); Meade, *supra,* at 173 Md. 302-03, 196 A. 333-34. We here use the term "equitable restrictions" to refer to the restrictions set forth in the parties' agreement. *See* Pollack v. Bart, 202 Md. 172, 176, 95 A. 2d 864, 866 (1953).

then owner for a reclassification of the subject property to the R.A. zone (Residential, Apartments, gross density 16 dwelling units per acre, net density 18 dwelling units per acre). The Board simultaneously denied a request for a special exception for elevator apartments, which would have permitted the construction of two 20-story apartment buildings containing a total of 637 apartment units. The then owner appealed from the denial of the special exception while neighboring property owners, who had opposed the grant of both the reclassification and the special exception, appealed from the grant of the reclassification.

On 18 March 1966 the circuit court affirmed the Board. Both the then owner of the subject property and the neighboring property owners appealed. While the appeals were pending in the Court of Appeals, the parties reached an agreement, embodied in a written document dated 12 July 1966, in which the neighboring property owners agreed to dismiss their appeal if the then owner of the subject property would impose certain restrictions upon the use and development of the land. This agreement, which provides that the equitable restrictions therein created shall run with the land and be binding upon present and all future owners thereof, reads, in pertinent part, as follows:

> "*THE PARTIES OF THE FIRST PART* [owners of the subject property] *ON BEHALF OF THEMSELVES AND THEIR HEIRS, SUCCESSORS, AND ASSIGNS AGREE AS FOLLOWS:*
>
> . . .
>
> "2. *Development within R-A Classification:* That no petition for rezoning or special exception of any kind shall hereafter be filed on the aforesaid 23.2797 acre tract of land, and that said tract of land shall be developed with Garden Apartment buildings with gross density of not more than sixteen (16) units per acre, net density not more than eighteen (18) units per acre, nor more than three (3) stories in height, and in accordance with

the applicable provisions and restrictions pertaining to the R-A Zone under Baltimore County zoning regulations in effect as of this Agreement; and further no use shall be made of said parcel for high rise apartments, commercial or office uses within the period of said restrictions hereinafter specified." (Emphasis in original.)

On 13 July 1966 the agreement was recorded among the land records of Baltimore County.

On 22 July 1971, 23.16 ± acres of the subject property, then classified in the D.R.-16 zone[2] were sold to the appellees, Edward J. Julio and Carl T. Julio, Co-Partners, T/A Cromwell Realty Company (owners). A deed was executed on 2 November 1971 and recorded among the land records on 4 November 1971.

On 5 May 1972 the appropriate Baltimore County authorities finally approved a plan of development which permitted the construction of 390 garden apartments on the subject property, the maximum allowed in the D.R.-16 zone. The first phase of development called for the erection of 240 units to be located in 19 buildings arranged in four separate rows. Two types of structures were approved: one consisting of 12 units in which there were to be four units on each of three levels, a terrace, first and second floor; and one consisting of 14 units in which there were to be two units on a terrace level partially below grade, and four units on a first, second and third floor respectively.

The topography of the subject property is such that it slopes from north to south with its highest elevation at the north and its lowest at the south. Construction began on the northernmost part of the property, a building permit having been obtained on 29 August 1972. Eight buildings, arranged

2. On 3 August 1970 the County Council for Baltimore County amended the Baltimore County Zoning Regulations by enacting Bill No. 100. By virtue of § 100.3A of the amended regulations, which created a new set of zoning classifications, the R.A. zone was redesignated as D.R.-16 (Density-Residential, 16.0 density units per acre). The amended regulations, approved by the County Executive and officially enacted on 5 August 1970, became effective on 19 September 1970.

in two rows, were erected. Each structure contains 12 units, four on each of three floors.

In the summer of 1973 the construction of a third row of six buildings began. Each of these six buildings, located on sloping ground, contains 14 apartments, four units on each of three floors to which access is achieved by an entrance on the north (high) side of the building, and two units on a terrace level to which access is obtained by an entrance on the south (low) side of the building. As a result of the slope of the land, the two units on the terrace level are predominantly below grade. Indeed, the ceilings of these two units are only four-and-one-half feet above grade. There was testimony to show that given the slope of the land the terrace level on the low side is necessary to support the other levels in which the remaining 12 units are located.

On 30 July 1973, after the footings for these six buildings had been poured, the appellants, neighboring property owners, some of whom were signatories to the 12 July 1966 agreement (protestants), filed a bill of complaint in the circuit court. The bill alleged that construction of these buildings would violate the provision of the 12 July 1966 agreement limiting construction on the subject property to buildings not "more than three stories in height." The bill sought to prohibit the owners "from erecting on the subject tract of land any building of more than three stories in height." Notwithstanding the filing of this bill, the owners proceeded with construction. The buildings were completed before the case was decided by the circuit court.

After hearings on 27 December 1973, 2 January 1974 and 4 January 1974, Judge Walter M. Jenifer wrote a carefully considered memorandum opinion and order in which he found, insofar as here relevant, that construction of the six structures containing 14 units each, including two units partially below grade level, did not violate the "three stories in height" restriction. He further found that, even assuming there were a violation, such violation would be immaterial because it would not be in derogation of the real purpose and intention of the parties at the time the agreement was executed. Accordingly, on 28 June 1974 he entered an order

dismissing the complaint, thereby denying the request for an injunction. It is from that order that this appeal is taken.

On appeal the protestants contend that the construction of these buildings constitutes a material violation of the "three stories in height" restriction. They assert that the meaning of the expression "three stories in height" is to be found in various dictionary definitions of the words, "story" and "height," and more particularly in the Baltimore County Zoning Regulations, in effect at the time of the 12 July 1966 agreement and, in fact, referred to in that agreement as governing the type of development to occur on the subject property. Those regulations, like the ones currently in effect, define a "story" as follows:

> "Story: That portion of a building included between the surface of any floor and the surface of the floor next above it, or if there be no floor above it, the space between such floor and the ceiling above it. A basement shall be counted as a story if its ceiling is over six feet above the average level of the unfinished ground surface adjoining the exterior walls of such story, or it is used for business or dwelling purposes." Baltimore County Zoning Regulations (1955) § 101; Baltimore County Zoning Regulations (1975 ed.) § 101.

The protestants maintain that the words "three stories in height," when given their ordinary meaning, are clear and unambiguous. They contend that because the terrace levels are to be used for dwelling purposes the buildings are more than three stories in height.

In addition, the protestants argue that under such circumstances the trial court erred when it "speculated as to the intent and motivating reasons behind the agreement" and when it determined the purpose and intent of the parties at the time the agreement was made. They claim that it failed to consider that the protestants did not "want the developer to pack all his people into one small area of the 23 acre tract by erecting high-rise buildings. They wanted them to be spread as evenly as possible so that at least the

appearance of congestion would be minimized. Thus when they opted for a limit of three stories they hoped to achieve not only height control but also to obtain a spread of the apartment units in some uniform fashion over the available area."

The owners contend that the construction of these buildings does not violate the equitable height restriction. They point out that the meaning of that restriction, which was not simply to limit buildings to three stories but rather to limit them to three stories in height, is ambiguous. They argue that both the Baltimore County Building Code (1956) in effect at the time the agreement was executed, and a subsequent 1971 addition to that Code, each containing different definitions of a "first story," preclude consideration of the terrace levels of these buildings as "first stories" and, therefore, as stories for the purpose of determining height in terms of stories.

In addition, the owners assert that the Building Code, in effect in Baltimore County when the agreement was executed in 1966 and which thereby became a part of the agreement,[3] defines "height" as follows:

> "When expressed in *stories* the *height* shall be taken as the number of stories in the building including any story where the ceiling is six (6) feet or more above the grade." (Emphasis supplied.) BOCA Building Code (1956) Part 3, § 300.3, *Definitions and Interpretations.*

They contend that, because the ceilings of the terrace levels are four-and-one-half feet above ground, the buildings are clearly no more than three stories in height.

---

**3.** Statutory provisions in effect at the time an agreement is made become a part of the contract. Denice v. Spotswood I. Quinby, Inc., 248 Md. 428, 433-34, 237 A. 2d 4, 7 (1968); Holmes v. Sharretts, 228 Md. 358, 367, 180 A. 2d 302, 306 (1962); Kramer v. Kramer, 26 Md. App. 620, 632, 339 A. 2d 328, 336. The Baltimore County Building Code, which consists of the BOCA Basic Building Code prepared by the Building Officials Conference of America, Inc., had been adopted by the Commissioners for Baltimore County on 23 November 1956 and was in effect at the time of the agreement. The Building Code presently in effect is the 1972 BOCA Code, adopted by Bill No. 33 on 19 June 1972.

Finally, the owners assert that there was no violation of the equitable height restriction because the buildings, when ·measured from the high side, are no more than three stories in height. They point out that the fact that an additional level is visible above grade on the low side is immaterial because the presence of the two apartments on the terrace level did not in any way increase the building height. They explain that the sloping topography at the site of these buildings necessitated a supporting understructure for the construction of any building containing four units on each of three levels. Thus, whether the requisite understructures were used for dwelling purposes or other purposes, the buildings would have had the same exterior appearance and overall height. They conclude that under these circumstances the form of development utilized here did not violate the intent and purpose of the equitable height restriction.

In construing the meaning of a restriction on the use of land, the court must determine the intent and purpose of the parties at the time the agreement was made, which is a question of fact.[4] In making that determination the court must consider the language of the instrument itself, giving the words their ordinary and generally understood meaning unless it plainly appears from the context that the parties intended to use them in a different sense, or that they have acquired a peculiar or special meaning in respect to the particular subject matter.[5] Where the language used in the instrument is ambiguous, the court must also consider the circumstances and conditions affecting the parties and the property at the time the agreement was made.[6]

In addition, because sound policy favors the free and unrestricted use of land by its legal holder,[7] whenever the

---

4. Oak Lane Corp. v. Duke, 196 Md. 136, 139, 75 A. 2d 80, 82 (1950); Scholtes v. McColgan, 184 Md. 480, 489, 41 A. 2d 479, 483 (1945); Legum v. Carlin, 168 Md. 191, 198, 177 A. 287, 291 (1935).
5. Levy v. Dundalk Co., 177 Md. 636, 648, 11 A. 2d 476, 481-82 (1948); Legum, *supra*, at 168 Md. 198, 177 A. 290-91; Himmel v. Hendler, 161 Md. 181, 187-88, 155 A. 316, 319 (1931).
6. Levy, *supra;* Legum, *supra.*
7. Harbor View Improvement Association v. Downey, 270 Md. 365, 371-73, 311 A. 2d 422, 425-26 (1973); Millison v. Fruchtman, 214 Md. 515,

language employed to express a restriction is ambiguous, the agreement is to be construed strictly against the party seeking to enforce it and all doubts must be resolved in favor of the free and unrestricted use of property.[8] Stated another way, an agreement restricting the use of land should be construed so as to avoid a finding of a violation thereof, when the covenant is as logically susceptible of such construction as of one entailing its violation.[9]

Applying these principles to the instant case produces a clear result. The equitable height restriction does not limit the buildings to "three stories" but rather to "three stories *in height.*" We are persuaded that the meaning of the expression "three stories in height" used in this particular equitable restriction, is ambiguous. The application of either the definition of the word "story," found in the Zoning Regulations, or the definition of the word "height," found in the Building Code, would provide a reasonable interpretation of the terms used in the equitable height restriction here. If the Building Code definition were employed, no violation could be found because the terrace level, the ceiling of which is only four-and-one-half feet above grade, would not be counted as a story. Thus, when counted from either the high or low side, the buildings in the third row would contain no more than three stories. On the other hand, if the definition in the Zoning Regulations were employed, a violation could be found because the terrace level would be counted as a story so that the buildings would contain more than three stories on the low side.

The application of the Zoning Regulations creates a

518, 136 A. 2d 240, 242 (1957); Norris v. Williams, 189 Md. 73, 76, 54 A. 2d 331, 332 (1947); Whitmarsh v. Richmond, 179 Md. 523, 527, 20 A. 2d 161, 163 (1941); McKenrick v. Savings Bank of Baltimore, 174 Md. 118, 127-28, 197 A. 580, 584-85 (1938); Ferguson v. Beth-Mary Steel Corp., 166 Md. 666, 672, 172 A. 238, 240 (1934).

8. Downey, *supra,* at 270 Md. 371-73, 311 A. 2d 425-26; Osborne v. Talbot, 197 Md. 105, 117, 78 A. 2d 205, 210 (1951); Scholtes, *supra,* at 184 Md. 489-90, 41 A. 2d 484; Yorkway Apartments v. Dundalk Co., 180 Md. 647, 650, 26 A. 2d 398, 399 (1942); Bartell v. Senger, 160 Md. 685, 693, 155 A. 174, 177 (1931); Saratoga Building & Loan Corp. v. Roland Park Apartment Stables Co., 146 Md. 152, 158, 128 A. 270, 271 (1924).

9. McKenrick, *supra,* at 174 Md. 127-28, 197 A. 584; Himmel, *supra,* at 161 Md. 187, 155 A. 319.

500

further ambiguity. While the buildings would contain more than three stories on the low side, they would contain less than three stories on the high side. The inherent difficulty is obvious. No given level or point from which to measure the "height" of the buildings is established in the equitable restriction limiting the buildings to "three stories in height." Under these circumstances, it is impossible to determine whether such buildings would violate the equitable restriction.

Here the circumstances and conditions surrounding the execution of the agreement indicate that the intent of the restrictions was threefold: (1) to restrict the type of use made of the property by prohibiting high-rise apartment, commercial or office uses and permitting garden apartment uses; (2) to restrict the density of the permitted garden apartment use by limiting the number of allowable units per acre; and (3) to control the height of the buildings for the usual purposes of preserving the view, open air and light of adjoining and surrounding property owners. There is nothing in these circumstances or conditions which would suggest that at the time of the agreement the parties were concerned in any way with the number of buildings to be utilized in achieving the maximum allowable density per acre or in the density of use in a given building (numbers of people or families per building). Thus, there is nothing which indicates that the restriction in height in and of itself was intended to control the density or type of use of the apartment buildings to be developed on the subject property. Rather the record establishes that the sole purpose of the height restriction was to control the height of such buildings.

Given this limited purpose the meaning to be ascribed to the equitable height restriction becomes clear. While the Zoning Regulations classify levels having a ceiling less than six feet above ground as a "story" if used for dwelling or business purposes, the Building Code specifically prohibits the classification of such partially below ground levels, irrespective of use, as "stories" when the purpose of the classification is to determine height in terms of stories. The

Zoning Regulations' definition is premised solely upon use and is totally unrelated to the concept of height, whereas the Building Code's definition is concerned solely with determining height and is totally unrelated to the use of the partially underground premises. Therefore, it is the Building Code and not the Zoning Regulations which give meaning to the words of the equitable height restriction which was here intended as a limitation on height and not on use.

Accordingly, we construe the equitable restriction limiting the development of the property to a building not more than three stories in height as meaning that the construction of a building containing three stories above ground plus a partially underground level having a ceiling less than six feet above grade is not prohibited. Such a construction is consonant with the view expressed by some few courts which have considered the question of how to measure height in terms of stories when the building contains a level partially below the grade,[10] even when that level is used for dwelling purposes.[11] Such a construction is also consonant with the policy of construing ambiguities in agreements restricting the use of land strictly against the party seeking enforcement, in such a way as to avoid a finding of a violation of the agreement and so that all doubt is resolved in favor of the free and unrestricted use of the property.

Here the buildings complained of contain no more than three stories on the high side and on the low side they contain no more than three stories above grade plus a partially underground level which has a ceiling only four-and-one-half feet above grade. The equitable restriction has not been violated. No other issue need be considered. Accordingly, the order of the trial court dismissing the bill of complaint for injunctive relief will be affirmed.

*Order affirmed.*
*Costs to be paid by appellants.*

---

10. Roland Park Civic League v. Lanco, Inc., 238 Md. 3, 10-11, 207 A. 2d 462, 466 (1965); Selvetti v. Building Inspector of Revere, 233 N.E.2d 915, 918 (Mass. 1968); O'Connell v. City of Brockton Board of Appeals, 181 N.E.2d 800, 803 (Mass. 1961); Smith v. North, 53 Cal. Rptr. 94, 96 (Cal.Dt.Ct.App. 1966). *See also* Snashall v. Jewell, 363 P. 2d 566, 571 (Ore. 1961).

11. Selvetti, *supra;* O'Connell, *supra.*