784 A.2d 545

**COUNTY COMMISSIONERS OF CHARLES COUNTY et al.,**

v.

**ST. CHARLES ASSOCIATES LIMITED PARTNERSHIP et al.**

**No. 7, Sept, Term, 2001.**

Court of Appeals of Maryland.

Nov. 8, 2001.

428

Kurt J. Fischer (Marta D. Harting of Piper, Marbury, Rudnick & Wolfe, LLP, Baltimore, Roger Lee Fink, County Attorney, LaPlata), all on brief, for petitioners

James A. Dunbar (Mark D. Maneche of Venable, Baetjer and Howard, LLP, on brief), Baltimore, for respondents.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and ROBERT L. KARWACKI (Retired, specially assigned), JJ.

CATHELL, Judge.

This case concerns a 1989 Settlement Agreement created by and between the County Commissioners of Charles County and St. Charles Associates, LP and the Interstate General Company, resolving various issues of contention between these two parties, as the developer proceeded its build-out of a large planned unit development district established in 1970 and located in Charles County. This 1989 Settlement Agreement

arose out of proposals to strengthen the planning process and improve the orderly growth of Charles County, and to ensure adequate infrastructure and facilities linked to the substantial development of property in this planned unit development district—all with the aim of ultimately serving the health, safety, and welfare of Charles County residents.

In litigation spanning the past decade, the two parties have disputed the obligations set forth under this Settlement Agreement.[1] More recently, on February 18, 1999, the Circuit Court for Charles County issued an order, which led to this appeal now before our court, in which the Circuit Court found that under the disputed 1989 Settlement Agreement the County was required to issue sewer and water connection permits to St. Charles Community, LLC and Dorchester Greens LP for the fee of $2,040 per permit on certain specified properties.[2] Additionally, the Circuit Court ordered that Charles County may not impose a fee in excess of $2,040 per water and sewer connection [3] for all residential lots or properties located in St. Charles Communities planned unit development ("PUD") until such time as the County obtains a rate report

---

1. In two prior cases, *County Commissioners of Charles County v. St. Charles Associates Limited Partnership*, No. 1153, 1994 Term, 104 Md.App. 759 (Apr. 19, 1995) ("St. Charles I") and *County Commissioners of Charles County v. St. Charles Associates Limited Partnership*, No. 1004, 1998 Term (Oct. 6, 1999) ("St. Charles II"), the Court of Special Appeals has affirmed the Circuit Court orders enforcing the terms of the Settlement Agreement against Charles County.

2. Specifically, the Circuit Court ordered that the County grant these two developers sewer and water permits for the properties located at: (1) 5030 Dorchester Circle; (2) 3803 Molly Miller Court; (3) 3825 Perch Court; and (4) 3839 Ocean Sunfish Court.

3. As a result of the Court of Special Appeal's Opinion in Case No. 1004, September Term 1998, decided after the Circuit Court issued the February 18, 1999 order now disputed on appeal, the County is limited only to the amount that they may impose on a sewer connection charge, until such time as the County obtains a proper rate study, in accordance with the Settlement Agreement, justifying an increased charge. With this opinion the Court of Special Appeals held that there is no limitation on the amount of the water connection charge that may be imposed, leaving a sum of $1,613 out of $2,040 pertaining to sewer connection charges as the amount actually relevant to this appeal.

approved by the Circuit Court, which substantiates an increased charge.[4]

On December 5, 2000 the Court of Special Appeals in an unreported opinion, *County Commissioners of Charles County v. St. Charles Associates Limited Partnership* ("St. Charles III"), affirmed the Circuit Court's February 18, 1999 order. We granted the County's petition for writ of certiorari to review that decision. Petitioners present three questions to this Court:

 1. Does ... language in a development agreement between a local government and a developer stating that the agreement "runs with the land" conclusively establish that the agreement binds all purchasers of individual lots in the development where the agreement also provides that it may be assigned, in whole or in part, only if certain procedures are satisfied?

 2. Is an assignment of contractual rights that do not run with the land effective where the subject matter of the assignment is not described sufficiently in the document

---

**4.** There is case law elsewhere that, in cases involving the creation of covenants running with the land that are created between developers and governmental entities, if such contractually created covenants so limit a governmental entity that it cannot perform a statutorily created governmental function, the covenant can be construed as unenforceable because of unreasonableness. *See Landau v. City of Leawood,* 214 Kan. 104, 109, 519 P.2d 676 (1974), where the Supreme Court of Kansas stated:

 "Insofar as the city is concerned, enforcement at this time is clearly unreasonable because, as pointed out above, compliance with the contractual limitations would render it impossible for the city to operate the system. What may have been reasonable in 1945 is not in 1974."

While we express no position on the viability of *Landau* as to Maryland law, we do note that in the case *sub judice,* the contractual agreement between the parties and the covenant contain a viable method whereby the fees may, if necessary, be adjusted in order to keep them reasonable. The county simply has not properly availed itself of the procedure. An unreasonableness argument would not exist to void a covenant running with the land where the covenant, and other agreements creating the covenant, contain, within the ambit of the covenant agreements themselves, an adequate method for addressing and resolving the issue of the reasonableness of the fees charged.

purporting to effect the assignment to make the subject matter capable of being readily identified?

3. Where a contract provides that an assignment must be made "as a part of" a transfer of real property, is an assignment effective where it is made 11 months after the transfer of the property and not pursuant to an instrument relating to the transfer of the property?

We answer yes to question one because the agreement at issue in this case is unambiguous in its terms and meets the elements of a covenant running with the land. Under the circumstances of this case, we also answer in the affirmative to questions two and three. The deeds conveyed the real property, and, by their terms, implicitly conveyed the rights and privileges of the agreement. Also, the assignment of contractual rights set forth in the agreement were effectively assigned via the deeds of conveyance. The eleven-month lapse in time did not hinder the effective assignment of contractual rights, and this subsequent assignment document merely was a redundant formalization of the assignment that had already taken place through the actual conveyances by deed.

## I. Statement of Facts[5]

In 1970, the Interstate General Company, predecessor in interest of St. Charles Associates, LP (collectively "St. Charles" or "SCA"), and the United States Department of Housing and Urban Development ("HUD") entered into a project agreement, which established a development plan for the planned and orderly development of St. Charles Communities ("SCC") as a new community under the New Communities Act of 1968, 42 U.S.C. section 3901 *et. seq.* After the project agreement was executed, the Board of County Commissioners of Charles County enacted new zoning ordinances amending its zoning ordinances in a July 12, 1972 order known as the

---

**5.** The Statement of Facts primarily relates to the complex history of the case, and, thus, is more a statement of the case than a statement of facts. Our actual addressing of the issues commences in "II. Discussion."

"Docket 90 Order," creating a planned unit development ("PUD") zone of SCC.[6] The 7,030 acres comprising SCC are located within the Mattawoman Creek drainage basin, which encompasses roughly eighty square miles in northern Charles County and southern Prince George's County. SCC covers approximately twelve square miles and ultimately may be built out to 24,730 units. To date, SCA and many other builders have constructed homes on lots within the PUD.

Due to a substantial increase in commercial and residential development in both Charles County and Prince George's County, and because the increased development rendered the Mattawoman Creek drainage basin and its soils unable to process the effluent from the area's individual sewage disposal systems, Charles County decided to construct a modern wastewater treatment plant. The wastewater treatment plant initially had the capacity to process 5.0 million gallons per day ("MGD"), and cost $33.3 million to construct.[7] The construction of the plant was completed in the early to mid 1970s.

In the 1980s, it became necessary to expand the capacity of the Mattawoman treatment plant from 5.0 MGD to 15.0 MGD. The county financed this expansion by adopting Resolution 88–81, which significantly increased the water and sewer connection charges to be paid by users of the Mattawoman plant. This Resolution adopted on October 18, 1988, increased sewer connection charges for the purpose of paying the debt service due to the costs of plant expansion. It is these increased charges brought forth by the adoption of Resolution 88–81, which spurred the issue and resultant case *sub judice.*

In 1989, a dispute arose between the County and SCA as to certain water and sewer capacity entitlements and connection charges. Specifically, on May 10, 1989, SCA filed a Com-

---

6. We note that a PUD is a type of floating zone.

7. The County received funds to construct this facility from various sources, including: the Environmental Protection Agency ("EPA"), HUD under the New Communities Act, the Maryland State Health Department, the Washington Suburban Sanitary Commission, and County funds.

plaint, petitioning the Circuit Court for Charles County for an accounting pursuant to the equity jurisdiction of the court, and for declaratory relief pursuant to the Maryland Code section 3–401 *et seq.*, of the Courts and Judicial Proceedings Article. In its complaint, SCA asserted that SCA should not be subject to the increased water and sewer connection charges imposed under the Resolution, because the County was already contractually bound, under a prior settlement agreement, to provide water and sewer treatment capacity for the 24,730 residential units planned to be built in the SCC.[8] SCA contended that the Mattawoman treatment plant and its initial 5.0 MGD capacity was constructed for the benefit of the PUD, a significant portion of the basin. Thus, the PUD had immediate entitlement to this initial capacity. SCA alleged that the PUD's federal status as a new community benefitted the County, because it led to the County's receipt of millions of dollars in federal grants and state matching funds designated specifically for the construction and maintenance of SCC's community infrastructure.

The County disputed SCA's claim of entitlement to the capacity and maintained that the key reason for the federal and state grants that financed the 5.0 MGD capacity was the health and safety concerns generated by the then failing septic systems in particular areas of the County.

On November 29, 1989, SCA and the County settled the original litigation with a settlement agreement (the "1989 Agreement").[9] This 1989 Agreement addressed the disputed connection charges and a number of other issues related to municipal services affecting the SCC. On March 6, 1990, the 1989 Agreement was incorporated into a Consent Decree by the trial court, and thus became a judgment of the court. Relevant portions of the "1989 Agreement" provide as follows:

---

**8.** This initial dispute is the underlying basis of the settlement agreement at issue here.

**9.** This settlement agreement we refer to as the "1989 Agreement" is termed and referred to as the "Municipal Services Agreement" by the petitioners in the case at bar.

## "AGREEMENT

### 1. GENERAL PROVISIONS

1.1 *Intent of the Parties:* The property subject to this Agreement is all of that Real Property located in Charles County, Maryland, described in Exhibit "A," and any other property acquired by SCA, its successors and assigns that is, pursuant to the proper exercise of County discretion, subsequently rezoned PUD and made subject to Docket 90 and all property previously developed by SCA and/or its predecessor, located in Charles County, Maryland. *It is intended and determined that the provisions of this Agreement shall constitute covenants which shall run with said Real Property and the benefits and burdens hereof shall bind and inure to the benefit of the parties hereto and their respective assigns and successors in interest. The Recitals are specifically incorporated in and made a part of this Agreement.* It is the further intent of the parties hereto, to provide certainty to SCA and the County regarding the number of residential units to receive water and sewer allocations each year, to ensure that SCA continues to provide balanced growth by developing and selling commercial and industrial property, to ensure that such commercial and industrial development is afforded adequate and timely water and sewer allocations in accordance with paragraph 4.1.4 hereof, and to ensure the provisions of adequate urban infrastructure and public facilities in conformance with the provisions of this Agreement.

. . .

1.3 *Assignment:* The rights and obligations of SCA under this Agreement may be transferred or assigned, in whole or in part, provided such transfer or assignment is made as a part of the transfer, assignment, sale or lease of all or a portion of the property subject to this Agreement and to Docket 90. SCA shall not transfer or assign its rights or obligations under this Agreement to other projects that are not located within St. Charles PUD.

. . .

4. *PROVISIONS FOR WATER AND SEWAGE SER-VICE AND FOR CERTAIN OTHER IMPROVE-MENTS*

 4.1 *Sewer and Water Facilities for Real Property Sub-ject to this Agreement:*

. . .

 4.1.3 In recognition of the County's desire to provide adequate infrastructure and services to the entire County, beginning January 1, 1990, SCA agrees to restrict its rate of development as provided herein. The parties agree that SCA is entitled to sufficient water supply and sewer treatment capacity to serve St. Charles PUD's planned 24,730 residential units. In accordance with its reserved entitlement to adequate sewer capacity to treat sewage flows from 24,730 dwelling units, the County agrees to expand the Mattawoman Sewage Treatment Plant capacity to ensure that adequate treatment capacity exists at all times to treat the sewage flows from the development of St. Charles PUD in accordance with the rate of development as set forth herein. . . .

. . .

 4.1.6 Accounting from October 19, 1988, SCA, its successors and assigns, agrees to pay a water and sewer connection charge in the amount of $2,040.00 for each residential unit. SCA further agrees to pay increased water and sewer connection charges ("increased charges") to the extent such increased charges are established as reasonable and properly applicable to SCA, in accordance with applicable federal, state and local law and provided the charges are based upon updated and necessary rate studies obtained by the County. The County agrees to obtain such updated and necessary studies on or before December 31, 1990 and to include in such studies the legal and accounting analysis necessary to establish the rational nexus between the charges and the

needs created by SCA's development. Upon completion of the studies obtained by the County and its determination of "increased charges," if any, SCA agrees to bring any challenges to the studies and determination of increased charges within 90 days of said completion and determination. SCA agrees to pay such increased charges, if any, to the extent they shall not have theretofore been paid; and the County agrees to refund to SCA any excess of such increased charges theretofore paid by SCA, within 90 days of the final determination (by agreement of the parties or by a court of law having jurisdiction) of such excess, together with interest on any such refunds as provided by law accruing from the dates of payment.

. . .

4.1.8 SCA agrees to limit and schedule its annual call on its reserved entitlement to sewer capacity as set forth in subparagraph 4.1.3 until St. Charles PUD reaches its planned build-out of 24,730 units only on the condition that the County agrees to provide St. Charles PUD with adequate sewer treatment capacity to serve St. Charles PUD when such capacity is required in accordance with subparagraphs 4.1.3. and 4.1.4. of this Agreement. SCA may determine the remaining unallocated capacity available from the Mattawoman Sewage Treatment Plant at any time pursuant to the County's open records policy. The County agrees that it shall not impose on SCA any of the increase in capital costs incurred by the County to expand the Mattawoman Sewage Treatment Plant in order to replace the treatment capacity originally constructed for the benefit of St. Charles PUD, unless the imposition of said increased costs is authorized by the studies referenced in paragraph 4.1.6 hereof." [Emphasis added.]

The 1989 Agreement became the basis of the current controversy between the parties. In 1990 and 1991, pursuant to the 1989 Agreement, the County turned to the public accounting firm of Ernst & Young to prepare a rate study to calculate the appropriate sewer and water connection charges to enable the County to determine whether customers were entitled to

refunds and to suggest recommended rates for all new customers thereafter. On January 2, 1991, SCA filed a motion to enforce the 1989 Agreement and consent decree, debating the procedures followed by the County in coordinating the study conducted by Ernst & Young, and challenging the County's general lack of compliance with some of the provisions set forth in the 1989 Agreement.

On June 22, 1992, the Circuit Court and, on April 19, 1995, the Court of Special Appeals ruled that the Ernst & Young study did not comply with the terms of the 1989 Agreement, because the study did not take into consideration that the initial capacity of the Mattawoman treatment plant was constructed for the benefit of SCC. In accordance with the Circuit Court's order, the County, on November 15, 1996, secured a second rate study to retrospectively determine the proper connection charges.[10] Upon the completion of this second study, SCA, on February 6, 1997, filed a motion to enforce the court's June 22, 1992 order, which ordered that the County, in good faith cooperation with St. Charles, conduct the appropriate study as the basis for water and sewer connection fees for St. Charles. On December 11, 1997, the Circuit Court issued an order in which it ruled that the second study also failed to comply with the 1989 Agreement requirements, but nevertheless found that SCA had to pursue its claim for refunds in the Maryland Tax Court.

On December 22, 1997, SCA moved to alter or amend the ruling, requesting that the Circuit Court expand its December 11, 1997 order to prohibit the County from charging more than $2, 040 per water and sewer connection in the PUD until the County submitted a proper rate study justifying a higher charge. On April 29, 1998, the Circuit Court granted St. Charles' motion and granted an injunction barring the County from charging SCA[11] more than the set $2,040 amount.

---

**10.** The second rate study was prepared by John J. Boland, Ph.D, and as such is sometimes referred to as the "Boland Study."

**11.** The Circuit Court specified that this injunction applied only to SCA and not to other builders within the PUD.

On May 20, 1998, SCA filed a request for clarification of the April 29, 1998 order, asking that the Circuit Court extend the injunction to all residential dwelling units within the PUD. The Circuit Court granted this request on August 4, 1998, and prohibited the County from charging in excess of $2,040 per water and sewer connection for residential properties in the PUD. In the memorandum accompanying the order, the Circuit Court ruled that other builders in the SCC could obtain the benefit of the 1989 Agreement, if the agreement were assigned to them pursuant to section 1.3 of the 1989 Agreement. The Circuit Court referenced section 1.3 when it stated, "[s]ection 1.3 of the Settlement Agreement states that any such transfer or assignment must be made 'as a part of the transfer, assignment, sale or lease of all or a portion of the property subject to this Agreement and to Docket 90.' This clarification simply reflects the parties' contract as set forth in the Settlement Agreement." The County appealed each of the Circuit Court's orders issuing the injunction.

On October 6, 1999,[12] the Court of Special Appeals filed its opinion in the 1998 appeal,[13] affirming in part and reversing in part the Circuit Court's orders. The Court of Special Appeals ruled that the County was prohibited under the 1989 Agreement from charging SCA and/or its assigns more than $1,613 in sewer connection fees until such time as the County submitted a study complying with the 1989 Agreement. The Court of Special Appeals, in its opinion, reversed the portion of the Circuit Court's order that required new rate studies concerning the appropriate water connection fees to be charged to SCA or its assigns, ruling that SCA had not challenged the County's $1, 950 water charge.

---

12. This case on appeal was styled *County Commissioners of Charles County v. St. Charles Associates Limited Partnership,* No. 1004, 1998 Term (Oct. 6, 1999) (St. Charles II).

13. The 1998 appeal is a consolidation of the County's two appeals from the Circuit Court's April 29, 1998 and August 4, 1998 orders granting SCA's request that the County be barred from charging SCA and any residential units in the PUD more than $2,040 in sewer connection fees.

During the course of the litigation, SCA continued to sell residential lots for development. On September 30, 1996, SCA conveyed a number of lots to its affiliate, Interstate Business Corporation ("IBC"), which subsequently conveyed these lots to Dorchester Green, LP ("Dorchester LP"). The deeds conveying these lots to IBC and Dorchester LP contained similar conveying language. The deed provided that the conveyance was, "SUBJECT to covenants, easements and restrictions of record. TOGETHER with the buildings and improvements thereupon erected, made or being and all and every the rights, alleys, ways, waters, privileges, appurtenances and advantages, to the same belonging or anywise appertaining." [14]

A year later on September 30, 1997, as part of a comprehensive corporate reorganization, SCA also conveyed a substantial portion of the land to a related company, St. Charles Community, LLC ("Community LLC"), a Delaware limited liability company. The deed conveying that land provided that SCA was conveying the land "TOGETHER WITH AND SUBJECT to covenants, easements and restrictions of record. TOGETHER with the buildings and improvements thereupon erected, made or being and all and every the rights, alleys, ways, waters, privileges, appurtenances and advantages, to the same belonging or anywise appertaining." Almost eleven months later, on August 27, 1998, SCA executed a document entitled "Assignment," purportedly pursuant to section 1.3 of the 1989 Agreement, again assigning its rights, title, and interest under the 1989 Agreement to Community LLC.[15]

In a letter dated August 28, 1998, the County indicated to SCA that it would not issue sewer and connection permits at the rate of $2,040 for lots owned by Dorchester LP or Community LLC, because the trial court's August 4, 1998 injunction did not apply to these developers. The County alleged that the deeds conveying the land did not assign the

---

**14.** This would apply to its remaining rights.

**15.** Such rights had already been assigned through the conveyances.

right to the sewer hook-up rates as required by the 1989 Agreement.

On December 2, 1998, while the 1998 appeal was still pending before the Court of Special Appeals, SCA filed a Motion for Further Enforcement of Injunction or, in the Alternative, for Contempt and Other Sanctions, arguing that the County was violating the Circuit Court's August 4, 1998 order by refusing to issue sewer and water connection permits to Dorchester LP and Community, LLC at a price of $2,040.

On February 18, 1999, the Circuit Court issued an order, granting SCA's motion to enforce the injunction and requiring the County to issue connection permits to all owners of residential lots in the SCC. The County appealed this order, and on August 27, 1999 the Court of Special Appeals granted the County's motion to stay the appeal pending the Court of Special Appeals determination of the County's 1998 appeal.

On December 5, 2000, the Court of Special Appeals affirmed the Circuit Court's February 18, 1999 order, barring the County from charging in excess of $2,040 per water and sewer connection for any residential lot or property located in SCC.[16] The Court of Special Appeals discussed the disputed language in sections 1.1 and 1.3 of the 1989 Agreement. The Court stated:

"The language of section 1.3 . . . states that rights under the Settlement Agreement, 'may be transferred or assigned.' . . . By contrast, the language of section 1.1 of the Settlement Agreement uses the term 'shall' throughout, stating, 'the provision of this Agreement *shall* constitute covenants which *shall* run with said Real Property and the benefits and burdens hereof *shall* bind and inure to the benefit of the parties hereto and their respective "

---

16. In this December 5, 2000 opinion, the Court of Special Appeals clarified that the part of the February 18, 1999 order dealing with the water connection charge was no longer an issue in that appeal. As such, the adjusted rate, which the County was enjoined from exceeding, reflected only sewer connection fee and was set at $1,613. SCA had not challenged the water fee, which, along with the $1,613, totals $2,040, the sum relevant here.

The Court of Special Appeals found that the plain language of the 1989 Agreement expressed the intent of the parties that the right to reduced sewer and water connection fees constituted a covenant running with the land in the PUD. Further, "given the totality of the Agreement, provision 1.1 is properly read as providing that the sewer connection rights run with the land, and section 1.3 is properly read as permitting the assignment of the sewer connection rights in limited circumstances." Accordingly, the right to reduced sewer connection fees runs with the land, and Dorchester LP and Community LLC became entitled to the benefit of the reduced fees automatically upon the conveyance of the land.

## II. Discussion

We hold that the 1989 Agreement does contain covenants that run with the land, the covenant relating to reduced fees at issue here. We will discuss the proper standard for interpreting such a contract or agreement, look at the language of the agreement itself, consider the role of the intent of the parties, and, generally, the nature of covenants that run with the land. When applied to the facts of this case, we hold that the terms of the agreement are clear, the intention of the parties is best evidenced by this agreement with no information to suggest otherwise and the applicable provisions of the agreement satisfy the elements of covenants running with the land.

As to question two, we hold that the deeds conveying the real property at issue here, while lacking express reference to the 1989 Agreement, were valid grants and assignments and by their terms encompassed any rights and obligations running with the land burdening or benefitting the parties as laid out in the recital or provisions of the 1989 Agreement recorded among the Land Records of Charles County. We arrive at the holding by construing the deeds in their entirety and the facts, circumstances, and intentions of the parties related to these conveyances, despite the fact that the initial deeds may make no express subject matter reference to the 1989 Agreement itself.

■ Finally, as to question three, we hold that the "as a part of" wording in section 1.3 of the 1989 Agreement does not require a contemporaneous assignment, pursuant to the assignment provision of the 1989 Agreement. But that even if this contention were true, our holding as to the previous questions, that the 1989 Agreement includes covenants running with the land, combined with the intention of the parties and the wording of the deeds equals an effective assignment at the time of conveyance. Moreover, under the circumstances of this case, the actual deeds of conveyance were, by their express terms, in fact, assignments. The subsequent assignment document was nothing more than a redundancy, further formalizing what contractual rights had, in reality, been already properly assigned by deed as of the date of the relevant conveyances.

### Part 1

#### a. Standard of Review–Interpretation of Contracts

■ Maryland has long adhered to the law of objective interpretation of contracts. *Auction & Estate Representatives v. Ashton,* 354 Md. 333, 340, 731 A.2d 441, 444 (1999); *Calomiris v. Woods,* 353 Md. 425, 435, 727 A.2d 358, 363, (1999); *Adloo v. H.T. Brown Real Estate, Inc.,* 344 Md. 254, 266, 686 A.2d 298, 304 (1996); *State v. Attman/Glazer P.B. Co.,* 323 Md. 592, 604, 594 A.2d 138, 144 (1991). The clear and unambiguous language of an agreement will not give way to what a party thought the agreement meant or was intended to mean. *Auction & Estate Representatives,* 354 Md. at 341, 731 A.2d at 445; *Adloo,* 344 Md. at 266, 686 A.2d at 304; *GMAC v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985); *Board of Trustees v. Sherman,* 280 Md. 373, 380, 373 A.2d 626, 629 (1977).

■ Further, "[i]n the interpretation of written contracts it is the duty of courts to ascertain, if possible, the intention of the parties, as manifested by the terms of the instrument. If the intention ... is plainly manifest upon the face of the instrument there is no room for interpretation...." *Maryland*

*Coal Co. v. Cumberland & Pennsylvania Railroad Co.*, 41 Md. 343, 352 (1875).

■ If an ambiguity arises, however, the court construing an agreement must "determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Daniels*, 303 Md. at 261, 492 A.2d at 1310.

■■ An ambiguity arises when the language of the contract is susceptible of more than one meaning to a reasonably prudent person. *Auction & Estate Representatives*, 354 Md. at 340, 731 A.2d at 444; *Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 596, 578 A.2d 1202, 1208 (1990) (citing *Truck Ins. Exch. v. Marks Rentals, Inc.*, 288 Md. 428, 433, 418 A.2d 1187, 1190 (1980)). "If the contract is ambiguous, the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract." *Heat & Power Corp.*, 320 Md. at 596–97, 578 A.2d at 1208.

### b. Construction of Real Covenants

Prior to 1955, when construing the meaning of covenants a strict construction standard was applicable to promote the free alienability of land. *See Turner v. Brocato*, 206 Md. 336, 345–46, 111 A.2d 855, 860 (1955).[17] This being so, the principle

---

**17.** There was ample case law that supported this principle calling for strict construction and how, when dealing with doubtful covenants restricting land, the courts were to hold the restriction to its narrowest limits. *Wells v. Osborne*, 204 Md. 375, 377–79, 104 A.2d 599, 599–601 (1954) (*Osborne II* ); *Trunck v. Hack's Point Community Assoc.*, 204 Md. 193, 196–97, 103 A.2d 343, 344 (1954); *Sorensen v. J.H. Lawrence Co.*, 197 Md. 331, 337, 79 A.2d 382, 385–86 (1951); *Osborne v. Talbot*, 197 Md. 105, 116–17, 78 A.2d 205, 210–11 (1951) (Osborne I); *Middleton Realty Co. v. Roland Park Civic League, Inc.*, 197 Md. 87, 93, 78 A.2d 200, 202–03 (1951); *Brady v. Farley*, 193 Md. 255, 258, 66 A.2d 474, 475 (1949); *Norris v. Williams*, 189 Md. 73, 76, 54 A.2d 331, 332–33 (1947); *Whitmarsh v. Richmond*, 179 Md. 523, 527, 20 A.2d 161, 163 (1941); *Ferguson v. Beth-Mary Steel Corp.*, 166 Md. 666, 672, 172 A. 238, 240–41 (1934); *Himmel v. Hendler*, 161 Md. 181, 187, 155 A. 316, 319 (1931); *Bartell v. Senger*, 160 Md. 685, 693, 155 A. 174, 177–78

"that doubt must be resolved in favor of the alienability of land," free and unfettered, was modified and does not always control; "[t]his rule of construction bows always to the more fundamental rule that wherever possible effect will be given to an ascertained intention of the parties." *Turner* 206 Md. at 352, 111 A.2d at 864. In *Gnau v. Kinlein,* 217 Md. 43, 48, 141 A.2d 492, 495 (1958), we addressed restrictive covenants when we stated:

> "Whether a restrictive covenant is personal to a grantee or a grantor, or to both, or binds their respective successors in title, and so the land by whomever owned from time to time, as well as whether a grantor intended to bind land retained by him, is a question of intention, which may be ascertained from the language of the conveyances alone or from that language together with other evidence of intent."

In *Belleview Construction Company v. Rugby Hall Community Assoc.,* 321 Md. 152, 158, 582 A.2d 493, 495 (1990), we examined the next step in reviewing restrictive covenants if the intent of the parties is not clear. We said, "If an ambiguity is present, and if that ambiguity is not clearly resolved by resort to extrinsic evidence, the general rule in favor of the unrestricted use of property will prevail and the ambiguity in a restriction will be resolved against the party seeking its enforcement." Judge Davidson, writing for the Court of Special Appeals, clearly recognized our holdings in the "restriction" case of *Metius v. Julio,* 27 Md.App. 491, 498, 342 A.2d 348, 353 (1975), saying:

> "In construing the meaning of a restriction on the use of land, the court must determine the intent and purpose of the parties at the time the agreement was made, *which is a question* of fact. In making that determination the court must consider the language of the instrument itself, giving the words their ordinary and generally understood meaning

---

(1931); *Guilford Association, Inc. v. Beasley,* 29 Md.App. 694, 699, 350 A.2d 169, *cert. denied,* 277 Md. 735 (1976).

unless it plainly appears from the context that the parties intended to use them in a different sense, or that they have acquired a peculiar or special meaning in respect to a particular subject matter. Where the language used ... is ambiguous, the court must also consider the circumstances and conditions affecting the parties and the property *at the time the agreement was made.*" [Emphasis added.] [Footnotes omitted.]

*See Belleview Constr. Co. v. Rugby Hall Community Assoc.,* 321 Md. at 157–59, 582 A.2d at 495–96; *Harbor View Improvement Ass'n, Inc. v. Downey,* 270 Md. 365, 371, 311 A.2d 422, 425 (1973); *Yorkway Apts., Inc. v. Dundalk Co.,* 180 Md. 647, 650, 26 A.2d 398, 399–400 (1942); *Whitmarsh v. Richmond,* 179 Md. 523, 527, 20 A.2d 161, 163 (1941); *McKenrick v. Savings Bank of Baltimore,* 174 Md. 118, 128, 197 A. 580, 584–85 (1938); *see also Markey v. Wolf,* 92 Md.App. 137, 152–53, 607 A.2d 82, 88, 89–90 (1992).

As alluded to, in more recent years, "a 'reasonableness rule'(termed a modern rule in some foreign jurisdictions) has been engrafted upon the general rule." *Markey,* 92 Md.App. at 150, 607 A.2d at 88. Currently, Maryland courts no longer apply a pure strict interpretation or construction, but apply rather, a reasonably strict construction when construing covenants. In *Markey,* the Court of Special Appeals, interpreting the position of this Court, adhered to the reasonableness rule when it considered the restrictive covenant at issue in that case. That court stated:

"In interpreting words used to create restrictions, *the court should endeavor to ascertain the real purpose and intention of the parties and to discover the purpose from the surrounding circumstances at the time of the creation of the restriction,* as well as from the words used. In endeavoring to arrive at the intention, the words used should be taken in their ordinary and popular sense, unless it plainly appears from the context that the parties intended to use them in a different sense, *or that they have acquired a peculiar or*

*special meaning in respect to the particular subject-matter."*

*Id.* at 153, 607 A.2d at 90.

### c. Covenants Running with the Land

We noted in the lease case of *Mercantile-Safe Deposit and Trust Company v. Mayor and City Council of Baltimore,* 308 Md. 627, 633–637, 521 A.2d 734, 737–38 (1987), that:

> "Whether a covenant touches and concerns the land may be considered in terms of the burdens or benefits it imposes. Thus, the test is met if the performance of the covenant will 'tend necessarily to enhance [the] value [of the land] . . .,' *Whalen* . . . .

> . . .

> It will be noted that the 'benefit' and 'burden' tests are stated in the alternative; if either is met, the covenant may be one running with the land. . . .

> . . .

> The City nevertheless argues that these covenants could not run with the land because they dealt with something not in *esse*—future restoration of the properties. This contention is based on *Spencer's Case.* . . .

> . . .

> The Maryland cases, therefore, give critical effect to the presence or absence of language binding successors and assigns. If these words are present, as they are here, the covenant is one running with the land or the functional equivalent thereof. That is, when the performance of the covenant touches and concerns the land within the meaning of the 'benefit or burden' standard, it is deemed one running with the land, even when it deals with something not in *esse,* when the agreement expressly binds successors and assigns. Indeed, this reasoning is entirely consistent with the majority American view that makes no distinction between affir-

mative and restrictive covenants for the purpose of determining whether a covenant runs with the land . . . .

. . .

. . . That the covenants are to be performed in the future cannot, alone, defeat their characterization as covenants running with the land . . . ." [Alterations in original.]

The Court of Special Appeals has also addressed the issue:

"One of our leading cases involving real covenants is *Gallagher v. Bell*, 69 Md.App. 199–202, 516 A.2d 1028 (1986), *cert. denied*, 308 Md. 382, 519 A.2d 1283 (1987), where . . . . [footnote 9] Judge Wilner,[18] for the court, furnished a perspective from what is sometimes referred to as 'the Rule in Spencer's Case,' 77 Ency. Rept. 72 (QB 1583), up to the time of the *Gallagher* decision, providing a complete review of the many aspects of covenant law."

*Bright v. Lake Linganore Association*, 104 Md.App. 394, 417 n. 9, 656 A.2d 377, 389 (1995). While an in-depth discussion on the background of real covenants is not necessary in the case *sub judice*, the nature of covenants can be drawn from *Mercantile, Gallagher*, and *Bright* and similar case law, which nature aids our interpretation of the agreement at issue in this case. *Bright*, referring to *Gallagher*, provides:

"[I]nitially, . . . in respect to land conveyances, '[c]ovenants . . . may be regarded as being either personal in nature or as running with the land.' The difference, we opined, depended on whether burdens and benefits of the promises made 'can devolve upon' the promisors' successors in title.

. . . [W]e noted that covenants to pay money for the maintenance of services relating to the land clearly, in our view, touched and concerned the land. We also stressed the importance of the parties' intent that covenants run with the land and opined that that intent may be determined from the language contained in the agreement or from other

18. Now a member of the Court of Appeals.

*indicia." Id.* at 418, 656 A.2d 377 (citation omitted) (one alteration in original).

Under Maryland law, a covenant can run with the land if: "(1) the covenant 'touch[es] and concern[s]' the land; (2) the original covenanting parties intend the covenant to run; and (3) there be some privity of estate and that (4) the covenant be in writing." *Mercantile-Safe Deposit and Trust Co.,* 308 Md. 627, 632, 521 A.2d 734, 736 (1987).

 "Nevertheless, as discussed in *Mercantile,* even a covenant that, by its very terms, runs with the land may not be enforceable if the parties creating the covenant intend that it not run." *Bright,* 104 Md.App. at 421, 656 A.2d at 391. Moreover, simply because the settlement agreement states that the covenant is one that runs with the land does not necessarily make it so. *Sanitary Facilities II, Inc. v. Blum,* 22 Md.App. 90, 102–03, 322 A.2d 228, 235 (1974) (citing *Glenn v. Canby,* 24 Md. 127 (1866)); *see also Bright,* 104 Md.App. at 421, 656 A.2d at 391 (holding that covenants by their terms that run with the land may not be enforceable if the parties did not intend).

### d. Interpretation of the 1989 Agreement and Whether it Created a Covenant that Runs With the Land

 The petitioners assert that the provisions of the 1989 Agreement placed at issue in the case at bar contradict one another, specifically that the language found in the beginning provision does not conclusively establish, due to the ensuing and different language of the agreement, that the agreement binds all purchasers of individual lots in the PUD. Or alternatively, that the agreement does not constitute a covenant running with the land, as the Court of Special Appeals held in its recent opinion. We disagree with petitioners.

In the case *sub judice,* not only is the language of the agreement plain, there also is no indication that the original covenanting parties intended that the covenants not run with the land. Indeed, almost all the evidence in the record reflects the contrary.

First, we address the language of the 1989 Agreement. The 1989 Agreement, established by two sophisticated parties,[19] in which the provisions are contained, through its very language dictates that the provisions run with the land. The wording of the 1989 Agreement, an agreement recorded among the Land Records of Charles County, "contain[s] ... expressions indicative of an intent that the covenants run with the land." *Bright*, 104 Md.App. at 421, 656 A.2d at 392. Specifically, the 1989 Agreement plainly states:

"It is intended and determined that the provisions of this Agreement shall constitute covenants which *shall run with said Real Property* and the *benefits and burdens* hereof shall bind and inure to the benefit of the parties hereto and their respective *assigns and successors* in interest. . . .

. . .

*The rights and obligations of SCA under this Agreement may be transferred or assigned,* in whole or in part, provided such transfer or assignment is made as a part of the transfer, assignment, sale or lease of all or a portion of the property subject to this Agreement and to Docket 90.

. . .

Accounting from October 19, 1988, SCA, *its successors and assigns,* agrees to pay a water and sewer connection charge in the amount of $2,040.00 for each residential unit." [Emphasis added.]

When creating this agreement, SCA and Charles County saw fit to include language in this agreement specifically pertaining to the intent of the parties that SCA's right and obligations could be transferred and assigned, and that the provisions of the 1989 Agreement, including the right to

---

**19.** The record reflects that in past litigation, the courts have noted how this agreement was made between two sophisticated parties, SCA a known developer and Charles County; thus, it is presumed that express wording in the document is there intentionally and reflects the parties' intentions that the agreement's provisions run with the land.

reduced connection fees, were covenants that ran with the land to "assigns and successors." Applying Maryland's law of the objective interpretation of contracts, we read this agreement plainly and find no contradiction in its language. Here, the parties caused the document to read, on its face, that its applicable provisions "run with the land" and bind and inure to the benefit of the then current parties and their respective assigns and successors in interest.[20]

In *Mercantile*, we stated that language that binds the "successors and assigns" is "strong evidence of the devolutive intent" of the parties. *Mercantile*, 308 Md. at 627, 638, 521 A.2d at 739. We also held that when such language is the only evidence of the parties' intent that the covenant run with the land, "it is virtually conclusive" on the issue, lacking evidence to the contrary. *Id.* at 639, 521 A.2d at 740. In the case now before us, there is no evidence to the contrary; if anything, the 1989 Agreement solidified the clear and plain intentions of the parties.

In *Bright*, the Court of Special Appeals noted how, "[w]e also stress[ ] the importance of the parties' intent that covenants run with the land" and opined that that intent may be determined from the language contained in the agreement "or from other *indicia.*" *Bright* at 418, 656 A.2d at 390. In the facts of this case, the parties' intent is best evidenced by the 1989 Agreement itself.

Moreover, the Court of Special Appeals in its unreported

---

**20.** Conceivably, not all of the "provisions" of the Agreement may qualify under Maryland's four-prong test as covenants running with the land. Some provisions may not "touch and concern" the land. As we point out, merely calling something in an agreement a covenant running with the land does not make it so conclusively. Therefore, if a provision of the 1989 Agreement might not qualify as a covenant running with the land for the purpose of section 1.1, section 1.3 could sweep-up such non-qualifying provision as an otherwise transferable or assignable right and/or obligation.

We need not undertake to catalog here which provisions of the 1989 Agreement run with the land, or do not. The fees, which are the subject of the present litigation, do run with the land.

opinion in *St. Charles III*,[21] interpreted the language of the 1989 Agreement, especially the use of the words "shall" and "may," and it found the agreement to constitute a covenant running with the land. The Court of Special Appeals opined:

"The use of the words 'may' or 'shall' does not, in and of itself, control the construction of a contract provision as permissive or mandatory. Those words, however, are given their ordinary meaning unless the context or purpose of the contract warrants a contrary conclusion.

Ordinarily, 'may' is permissive in nature.... The term 'shall' is generally an imperative....

The language of section 1.3, quoted above, states that rights under the Settlement Agreement, '*may* be transferred or assigned.'... By contrast, the language of section 1.1 of the Settlement Agreement uses the term 'shall' throughout, stating, 'the provision of this Agreement *shall* constitute covenants which *shall* run with said Real Property and the benefits and burdens hereof *shall* bind and inure to the benefit of the parties hereto and their respective assigns and successors in interest.' ... Under the express language of the Settlement Agreement, SCA was *permitted*, but *not required*, to assign its settlement rights. Further, the terms of the agreement indicate that those rights are covenants that run with the land. This is the proper interpretation of sections 1.1 and 1.3 of the Settlement Agreement....

. . .

The purpose of the Settlement Agreement, to establish certainty in the development of SCC and in the sewer allocations, would not be served by interpreting it to mean that settlement rights are lost unless they are assigned. If this were the proper interpretation of the Agreement, the number of set-fee sewer connections in SCC could, and would, fluctuate. To the contrary, the purpose of the

**21.** *County Commissioners of Charles County v. St. Charles Associates Limited Partnership,* No. 72, 1999 Term (December, 5, 2000).

Settlement Agreement—certainty—will be furthered by an interpretation that provides that the settlement rights run with the land and are transferred automatically when the land is conveyed.

. . .

Furthermore, if section 1.3 is given a mandatory, and not a permissive, interpretation, section 1.1 of the Settlement Agreement will be rendered meaningless. Such an interpretation runs contrary to the rules of contract interpretation. Therefore, given the totality of the Agreement, provision 1.1 is properly read as providing that the sewer connection rights run with the land, and section 1.3 is properly read as permitting the assignment of the sewer connection rights in limited circumstances." [Citations omitted.]

While we do not necessarily ascribe to all of the Court of Special Appeals' interpretations of the language of the Agreement, we concur in its result. We hold that the parties intended for this agreement to run with the land. As noted, *supra,* in *Mercantile,* we stated the four elements necessary to create a covenant that can run with the land: "(1) the covenant 'touch and concern' the land; (2) the original covenanting parties intend the covenant to run; and (3) there be some privity of estate and that (4) the covenant be in writing." *Mercantile-Safe Deposit and Trust Co.,* 308 Md. 627, 632, 521 A.2d 734, 736 (1987). All of these elements exist as to the provisions at issue in the case at bar.

Relatively recently, similar arrangements concerning the matter of water and sewer service to properties have been held, elsewhere, to create covenants running with the land. In *Coggeshall Development Corp. v. United States,* 23 Cl.Ct. 739, 740 (1991) a motion to dismiss against a successor developer had been granted below on several grounds, one of which was that the particular covenants did not run with the land. The United States Claims Court framed the case as:

"This case is before the court on defendant's motion to dismiss for failure to state a claim upon which relief can be granted. Plaintiffs are successors-in-title to Navy surplus property, and seek compensation from defendant for the alleged violation of the terms of the original deed."

The provision in dispute provided:

"The grantor hereby grants to Grantee all sewer lines located within said Parcels 1 and 2, along with the *perpetual and assignable right to connect at the boundary of Grantee's property with certain sewer mains owned by Grantor and located on other land of Grantor.* Grantor covenants that it will maintain its sewer mains and appurtenances which connect sewer lines in the fee area to the City of Newport's public sewer system.

. . .

Wherever in this Deed reference is made to the Grantor or Grantee, the same shall be read and construed so as to include the successors in title and assigns of both Grantor Grantee, as well as any person, firm or entity claiming by, through or under said Grantor or Grantee, and their respective successors in title and assigns.

*All covenants and agreements as are herein contained in this Deed, whether made by Grantor or Grantee, shall be deemed and shall constitute covenants running with the land, and shall be binding upon the successors in title and assigns of both Grantor and Grantee,* and those claiming by, through or under either of them. . . ." *Id.* at 741.

The court held:

"Defendant deeded the property . . . with the 'perpetual and assignable right to connect the boundary of grantee's property with certain sewer mains owned by grantor and located on the other land of grantor.' RIPA's [22] right to connect with the sewer mains and the government's obligation to maintain those sewers 'touch and concern' the

---

22. A successor in title to the original covenanting party.

subject property and are, therefore, covenants which run with the land.... The deed, therefore, determined the rights and obligations of the parties and their successors concerning the land in question.

... As such, plaintiffs have a contractual relationship with the United States, and may maintain a breach of contract action against defendant for violation of their rights under the deed." [23] *Id.* at 742–43.

*See also City of Perrysburg v. Koenig,* 1995 WL 803592, at *3, 1995 Ohio App. LEXIS 5334, at *8 (1995), which involved an agreement between a city and a developer, that in return for the city providing sewer service to the development, the developer would include provisions in conveyances creating a "restrictive covenant" requiring subsequent grantees to agree to annexation when certain other conditions occurred. The agreement between the city and the developer was recorded. However, the developer failed to include the provisions about annexation in subsequent off-conveyances, and some of those purchasers refused to cooperate with annexation efforts. The issue was whether the annexation provision was a covenant running with the land in the absence of any express provision in the master agreement between the city and the developer that the provision in respect to annexation was intended to run with the land, and in the absence of any mention in the off-conveyances of the provision. Although the case was determined on the grounds that an equitable servitude was created,[24] the court noted: "there is little question that agreements

---

**23.** On remand, the plaintiffs were not able to establish that the contract had been breached by the government's refusal to permit more than 12,000 gallons of discharge per day. *See Coggeshall Development Corp. v. United States* 29 Fed. Cl. 264 (1993).

**24.** "An equitable servitude or obligation is formed if the following elements exist: (1) there must be an agreement between the parties in which the parties demonstrate an intent to bind the successors to the land, (2) the agreement must be within the statute of frauds, (3) there must be vertical privity between the party who agreed to burden the land and his or her successors, (4) the promise must touch and concern the land, and (5) successors in interest must take with actual or constructive notice of the burden. As discussed above, these elements

to provide water and sanitary sewers provide a benefit to the physical use or enjoyment of the land thereby satisfying the element which requires that the covenant touch and concern the land."

In *Shunk v. Palm Beach County,* 420 So.2d 394 (Fla.App. 1982), the primary agreement between the developer and the governmental entity was not recorded, unlike the present case where the base agreement was recorded among the land records. Accordingly, the Florida agreement would not have been found by a title examiner inspecting the chain of title for instruments that might have created restrictions or covenants. The Florida intermediate appellate court, as relevant to the issue now being discussed, stated:

> "We are asked, on this appeal, to reverse the trial court's finding that an *unrecorded* contractual agreement, never included or referred to in any deed of record, is not a covenant running with the land.... [W]e affirm.
>
> . . .
>
> ... A respected commentator has stated that '[c]ovenants affecting land may also be created by contract between the owner and another without the necessity of a formal deed. But to constitute constructive notice *such collateral agreements must be duly recorded.*' Furthermore, '[t]he weight of authority seems to be that the owner of land is bound by restrictive covenants only if they appear in his own chain of title.' "

*Id.* at 394–95 (emphasis added) (alterations in original) (citation omitted). In the case *sub judice,* we were informed that

do exist in this case if it is determined that it was the intent of the parties that the burden accepted by the developers was to attach to the land."

*City of Perrysburg,* 1995 WL 803592 at *4, 1995 Ohio App. LEXIS at 5334 at *10 (citation omitted). In the instant case, even if the provision of the agreement between the parties had not used "run with the land" and "successors and assigns" language, a reasonable argument could be made that an equitable servitude was created. The end result, under the circumstances here present, would be the same.

the base agreement between the parties was recorded among the land records and, upon proper title examination, the covenants at issue here would have been discovered.

The Supreme Court of Alabama, in *Water Works and Sanitary Sewer Board of the City of Montgomery v. Campbell,* 267 Ala. 561, 564, 103 So.2d 165, 166–67 (1958), noted that the governmental entity entered into an agreement with a property owner that in return for the granting of a sewer easement across his property, the property owner would not be charged with any sewer fees. The agreement, as relevant to the issue now being considered in the case at bar, provided: "[N]o charge ... shall ever be made against any lands of the grantors, their heirs or assigns...." Subsequent owners of the subject property brought an action against the sewer authority, alleging that they were being charged in violation of the above provision. Defending, the sewer authority, as to the issue relevant to the case at bar, alleged that the covenants in the original agreement were personal to the then property owner and did not inhere to the benefit of subsequent property owners. In *Campbell,* 103 So.2d at 167–68, holding for the subsequent property owners, and quoting from one of its previous cases, *MacMahon v. Baumhauer,* 234 Ala. 482, 487, 175 So. 299, 304 (1937), the court stated:

> "There, the contract stated that 'the intent of this instrument being to preserve to the person therein named, and their property, and to their heirs, executors and assigns, the perpetual free use of said sewer with no liability upon them or their property to contribute hereafter toward the further building and construction or maintenance and operation of the sewer....' ... That free use was protected by a covenant running with the land. Of this right such original owners and grantors could not be divested except by due process of law-due notice and right to defend or maintain such right of property....
>
> ...
>
> ... Also, a mere reading of the clear terms of the contract evinces unmistakably that the heirs or assigns of Thomas were exempted as well as the grantors.

. . .

Certain it is that as between individuals, we would enforce the contract before us. The legal obligation and morality of the city or one of its boards should equal that of the marketplace." [Citations omitted.]

*See also Bond Brothers v. Louisville & Jefferson County Metropolitan Sewer District,* 307 Ky. 689, 697–99, 211 S.W.2d 867, 871–73 (1948), involving a judgment subsequently incorporated in a contract between the District and predecessors in title to the then current land owners. Predecessors in title to the land owner had granted a right-of-way over a portion of their land for the District to construct a sewer in return for the right of the property owners to access the sewer without fee. A deed, subsequent to the contract, provided that all grants were to "successors and assigns" and were to "run with the land." The court held:

"We, therefore, construe the judgment and deed to have granted Producers, for a valuable consideration, the use of this sewer, and that such right and use passed to its successors in title to the land for similar industrial purposes.

. . .

If the representatives of the city made a bad bargain, as subsequent events have developed, we see no more authority for relieving the city . . . of that bargain without compensation than there was for the taking of the right of way over the land in the first place. . . .

. . .

In the present case there is not only a contract but a judgment. We perceive no authority in the city, a party to that case, or . . . the District, . . . to nullify the judgment and cancel a fixed and adjudicated right of a successful litigant."

*Id.* at 695–99, 211 S.W.2d 867; *but cf. City of Glendale v. Barclay,* 94 Ariz. 358, 385 P.2d 230 (1963) holding that the

original covenantor remains liable, as well as subsequent grantees.

There is no contention over the fact that the 1989 Agreement is in writing or that there is privity of estate between SCA and Community LLC and Dorchester LP. Privity of estate clearly exists as title to property was transferred from SCA to both Community LLC and Dorchester LP. The County makes no argument to the contrary. As such, elements three and four of the test are satisfied, leaving only elements one and two for discussion. The second element, that the parties intend the covenant to run with the land, we explained in the previous paragraphs. The 1989 Agreement, via its plain language, is the paramount evidence of the intention of the parties, and we conclude that the parties did, indeed, intend the relevant provisions of the agreement to be covenants that run with the real property located in the PUD involved in this litigation.

 Finally, it is clear that the covenant "touches and concerns" the land. In *Bright,* the Court of Special Appeals "noted that covenants to pay money for the maintenance of services relating to the land clearly, in our view, touched and concerned the land." *Bright,* 104 Md.App. at 418, 656 A.2d at 390. Likewise, the facts of this case are similar, as the issue revolves around a capped sewer connection charge for individual residential lot owners. This agreement dealing with the cost of utilities is of the sort that normally touches and concerns the land; moreover, it benefits the owners of the land. It also burdens the owners and benefits Charles County in that it obligates the subsequent owners of the property to pay the fees. Subsequent owners are subject to having such fees collected by the County just as the County, by reason of the agreement, is obliged to accept them.

 Again, the *Mercantile* case is instructive. There we explained the touch and concern element for a covenant to run with the land. As indicated earlier, we stated:

"that [for] 'a covenant to run with the land [it] must extend to the land, so that the thing required to be done will affect

the quality, value, or mode of enjoying the estate, conveyed, and thus constitute a condition annexed, or appurtenant to it. . . . Applying this definition, Maryland cases have determined a variety of agreements to be covenants running with the land: an undertaking, in a mortgage, to pay ground rent and taxes; an agreement to keep mortgaged property insured and to make repairs or rebuild; a contract not to construct improvements without prior approval of external design and location; and an agreement to share pro-rata the cost of installation of certain streets and utilities.

Whether a covenant touches and concerns the land may be considered in terms of the burdens or benefits it imposes. Thus, the test is met if the performance of the covenant will 'tend necessarily to enhance [the] value [of the land] . . . .'.

. . .

The Maryland cases, therefore, give critical effect to the presence or absence of language binding successors and assigns. If these words are present, as they are here, the covenant is one running with the land or the functional equivalent thereof. That is, when the performance of the covenant touches and concerns the land within the meaning of the 'benefit or burden' standard, it is deemed one running with the land, even when it deals with something not in *esse*, when the agreement expressly binds successors and assigns. Indeed, this reasoning is entirely consistent with the majority American view that makes no distinction between affirmative and restrictive covenants for the purpose of determining whether a covenant runs with the land."

*Mercantile* at 632–36, 521 A.2d at 737–38 (citations omitted).

In the present case, the 1989 Agreement meets the "touch and concern" element for the covenant to run with the land, it burdens and benefits the County as to this particular aspect and burdens and benefits the successors and assigns of SCA. Moreover, the 1989 Agreement by its terms, may benefit the County in other aspects, *i.e.,* roads, and burden SCA, its

successors and assigns, Thus, we hold that all four elements of a covenant running with the land exist in this case.

## Part 2

■■■ To reiterate the relevant facts of our case, on September 30, 1996, SCA conveyed a number of its lots to its affiliate, IBC, which subsequently conveyed by deed these lots to Dorchester LP. On September 30, 1997, as part of a comprehensive corporate reorganization, SCA also conveyed a substantial portion of the land to a related company, Community LLC. In both of these instances, the deeds conveying that land from SCA to these two entities, provided that SCA was conveying the land "*TOGETHER WITH AND SUBJECT to covenants,* easements and restrictions of record. *TOGETHER with* the buildings and improvements thereupon erected, made or being and all and every the *rights,* alleys, ways, waters, *privileges,* appurtenances and advantages, to the same belonging or anywise appertaining." (Emphasis added.)

Petitioners claim that because these two deeds do not explicitly mention, describe, or refer to the 1989 Agreement, they do not effect a valid transfer of rights under the 1989 Agreement to these two entities. Petitioners note a body of out of state case law and contract treatise commentary standing for the notion that to effectuate a valid transfer of contractual rights, the subject matter of the assignment must be described to a degree making it capable of being readily identified. Further, petitioners claim the deeds contain no language specifically evidencing an intent to assign, in whole or in part, SCA's rights or obligations under the 1989 Agreement.

Again, this case harkens back to the intent of SCA and Charles County at the time they created the 1989 Agreement and these subsequent deeds. Maryland law requires us to not only consider the subject matter of the deeds, which, albeit not expressly, implicitly pertains to the 1989 Agreement; but also to consider the intent of the parties as expressed in the deeds now at issue.

▉ The case law setting forth the general rules of construction of deeds affirms that, "the court should take into consideration the language employed, the subject matter, and surrounding circumstances," essentially the deed as a whole. *Weiprecht v. Gill,* 191 Md. 478, 484–85, 62 A.2d 253, 254–55 (1948); *see generally Neavitt v. Lightner,* 155 Md. 365, 142 A. 109 (1928); *Brown v. Reeder,* 108 Md. 653, 71 A. 417 (1908). Likewise, there is an equal abundance of Maryland case law directing the Court to strongly consider the intention of the parties. *See Chevy Chase Land Co. v. U.S.,* 355 Md. 110, 123, 733 A.2d 1055, 1062 (1999) (stating that in construing a deed, the Court of Appeals must consider the deed as a whole, viewing its language in light of facts and circumstances of the transaction at issue and the intention of the parties ascertained from whole contents of the deeds); *Brown v. Whitefield,* 225 Md. 220, 225, 169 A.2d 920, 922 (1961) ("In construing a deed, effect which most nearly accords with the intention of the parties is given first consideration."); *Whittington v. Mann,* 211 Md. 199, 126 A.2d 617 (1956) (stating how the language used by the parties will be of the utmost importance in ascertaining their intent); *Adams v. Parater,* 206 Md. 224, 111 A.2d 590 (1955) (noting how every part of a deed is to be given effect and when possible the intention of the parties must prevail); *Weiprecht supra* (affirming that the intention of the parties must prevail); *Hammond v. Hammond,* 159 Md. 563, 152 A. 107 (1930); *Maryland State Fair, Inc. v. Schmidt,* 147 Md. 613, 128 A. 365 (1925); *Brown v. Reeder,* 108 Md. 653, 71 A. 417 (1908); *Zittle v. Weller,* 63 Md. 190 (1885).

Other states are in accord that when construing a deed, courts must seek to give effect to the intent of the parties to the deed. *See McGeechan v. Sherwood,* 2000 Me. 188, 760 A.2d 1068 (2000); *Trade 'N Post L.L.C. v. World Duty Free Americas, Inc.,* 2001 N.D. 116, 628 N.W.2d 707 (2001).

The deeds at issue in the facts of this case read, in relevant part, "TOGETHER WITH AND SUBJECT to covenants, easements and restrictions of record. TOGETHER with the buildings and improvements thereupon erected, made or being

and all and every the rights, alleys, ways, waters, privileges, appurtenances and advantages, to the same belonging or anywise appertaining." Indeed, a sewer connection fee, imposed on each individual residential lot, would constitute rights, privileges, and burdens pertaining to that lot. Further, the 1989 Agreement, created between two sophisticated parties, was written in great detail, with numerous recitals and subsequent provisions—specifically, a provision concerning sewer connection fees and a capped amount. It was, as we have noted, then recorded among the land records. We hold the parties intended the 1989 Agreement to have force and effect and to burden and benefit the residential lots located in the PUD. When SCA conveyed the land to Community LLC and Dorchester LP, these two grantees were to receive the benefits and burdens of the reduced sewer connection fee secured under the 1989 Agreement that, by its terms, was to run with the land. The County was well aware of this agreement and its terms. The parties intended this agreement to affect these properties and the fact that the deeds may not explicitly reference the 1989 Agreement, specifically its terms related to a sewer connection charge, does not detract from the fact that the existing language of the deeds intended and should be understood as conveying the rights and privileges associated with the four properties now at issue, and other relevant parcels. It follows, that of the rights and privileges conveyed in the land sale, the two entities and the County knew the reduced sewer connection charge to be a subject matter of the deeds and capable of being readily identified.

### Part 3

■■■ Again, the transfer of property and an assignment of rights attached to the property in the case *sub judice*, first occurred by deed on earlier dates between SCA and Community LLC and Dorchester LP; however, the 1989 Agreement was not specifically assigned *by separate document* at that time to either of these entities. It was roughly eleven months later, on August 27, 1998, that SCA effectuated a reassign-

ment of the 1989 Agreement to Community LLC by a separate document termed "Assignment."

Petitioners contend that the "as part of" language found in section 1.3 [25] of the 1989 Agreement mandated that to be a valid assignment under the terms of the 1989 Agreement itself, the assignment must have been made "as a part" of the transfer of property to Community LLC and Dorchester LP, *i.e.*, contemporaneous in time with the conveyance of property, and not later via a separate document.

What the petitioners fail to accept (for purposes of this case) is that SCA's successors and assigns, in this case, Community LLC and Dorchester LP, already had, during this eleven-month time period that lapsed between the transfer of real property and the redundant assignment of the 1989 Agreement to Community LLC by separate document, the benefits of the 1989 Agreement. Previously in this opinion, we have held that the 1989 Agreement properly contained covenants running with the land. As such, the residential lots in the PUD are bound and burdened by the covenants contained in the 1989 Agreement. Secondly, we held that the deeds conveying land in the case *sub judice*, though not expressly referencing the 1989 Agreement, were effective conveyances of real property and an effective assignment of the contractual rights that were created as covenants running with the land as set forth in the 1989 Agreement. The fact that SCA waited eleven months to again assign the 1989 Agreement to Community LLC by separate document was of no effect, as to the covenants running with the land, because it was nothing more than a redundant assignment. Being redundant in the first instance, whether the subsequent document complied with the

---

**25.** As stated, *supra*, the wording of section 1.3 reads as follows:

"1.3 *Assignment:* The rights and obligations of SCA under this Agreement may be transferred or assigned, in whole or in part, provided such transfer or assignment is made as a part of the transfer, assignment, sale or lease of all or a portion of the property subject to this Agreement and to Docket 90. SCA shall not transfer or assign its rights or obligations under this Agreement to other projects that are not located within St. Charles PUD."

provisions of section 1.3 is, under the facts of this case, immaterial.

Moreover, the deed of conveyance, by its very terms, was an assignment. It provided, in relevant part, in its granting clause:

"[T]he said Grantor, party of the first part, does hereby grant, convey *and assign,* unto ST. CHARLES COMMU-NITY, LLC, a Delaware limited liability company, its successors and assigns, in fee simple, all those pieces or parcels of ground . . ., and described as follows, to wit:

TOGETHER WITH AND SUBJECT to covenants . . . and restrictions of record."

In its habendum clause, the instrument provided:

"TO HAVE AND TO HOLD the said . . ., land . . .; together with the rights, . . . and advantages thereto belonging . . . unto and to the proper use and benefit of [the grantee], its successors and assigns, in fee simple forever." [Emphasis added.]

The intention of the parties is clear. Hence, when the language of the deeds stated that Community LLC and Dorchester LP were granted, conveyed and assigned and took the property "TOGETHER WITH AND SUBJECT to covenants, easements and restrictions of record TOGETHER with the buildings and improvements thereupon erected, made or being all and every the rights, alleys, ways, waters, privileges, appurtenances and advantages, to the same belonging or anywise appertaining," these entities did, in fact, take subject to the 1989 Agreement, recorded among the Land Records of Charles County, that created covenants running with the land. We hold that the 1989 Agreement created covenants running with the land; the deeds effectively and validly assigned the relevant contractual rights laid out in the 1989 Agreement, and thus the assignment was contemporaneous with the conveyance of property. At any point after the deeds had been effectuated, be it one day, eleven months or later, SCA did nothing more than, redundantly, via a separate document titled "Assignment," reassign an already effective assignment.

## III. Conclusion

There has been twelve years of complex litigation leading up to the case *sub judice*. We now affirm the Court of Special Appeals' December 5, 2000 ruling stating that the County is barred from imposing a combined water-sewer connection fee in excess of $2,040 for any residential property located in this SCC, pursuant to the terms of the 1989 Agreement, unless properly modified after appropriate studies made in accordance with the 1989 Agreement. We hold that the 1989 Agreement created covenants running with the land. Because this agreement contains covenants running with the land, it binds Charles County and SCA, or its successors or assigns. Quite simply, the language of the development agreement is clear and unambiguous, the parties intent is certain; the agreement was meant to "run with the land."

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY PETITIONERS.**